**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

---------------------------------------------------------x

LINGJIA WANG; MO WANG; MENG WANG; SIZHE CHEN; YUSHENG HUANG; WEN LIU; MIN RAN; YAN SHI; XU WANG; ZONGLE WANG; QIAN WU; KAIJIE ZHANG; JING LI; XUAN ZHANG; and NINI DONG,

*Plaintiffs*,

vs.

Case No.: 1:26-cv-06434

**COMPLAINT**

CANAM ENTERPRISES, LLC; CANAM NEW YORK METROPOLITAN REGIONAL CENTER, LLC; CANAM NY GP VII, LLC; CANAM NEW YORK REGIONAL CENTER, L.P. VII; TOM ROSENFELD; JEMB ALBEE SQUARE, L.L.C.; JEMB REALTY CORPORATION; MORRIS B. JEROME; JOSEPH L. JEROME; JACOB JEROME; LOUIS J. JEROME; FOREST CITY RATNER COMPANIES, L.L.C. (formerly a subsidiary of Forest City Realty Trust, Inc.); and MARSHALL & STEVENS INCORPORATED,

*Defendants*.

---------------------------------------------------------x

Plaintiffs Lingjia Wang, Mo Wang, Meng Wang, Sizhe Chen, Yusheng Huang, Wen Liu, Min Ran, Yan Shi, Xu Wang, Zongle Wang, Qian Wu, Kaijie Zhang, Jing Li, Xuan Zhang, and Nini Dong (collectively "Plaintiffs"), by and through undersigned counsel, file this Complaint against CanAm Enterprises, LLC; CanAm New York Metropolitan Regional Center, LLC; CanAm NY GP VII, LLC; CanAm New York Regional Center, L.P. VII; Tom Rosenfeld; JEMB Albee Square, L.L.C.; JEMB Realty Corporation; Morris B. Jerome; Joseph L. Jerome; Jacob Jerome; Louis J. Jerome; Forest City Ratner Companies, L.L.C. (formerly a subsidiary of Forest City

Realty Trust, Inc.); and Marshall & Stevens Incorporated (collectively "Defendants"), and allege as follows:

## INTRODUCTION

1. This is a federal securities fraud action arising from the fraudulent offer and sale of limited partnership interests in CanAm New York Regional Center, L.P. VII ("LP VII"). Between September 2016 and early 2017, Defendants raised approximately $66 million from 120 Chinese national investors through LP VII. Each investor contributed $500,000 in capital and paid a non-refundable $50,000 issuance fee in reliance on the Confidential Information Memorandum ("CIM") (Exhibit 1) dated September 15, 2016 and related offering materials. As alleged below, those offering materials contained numerous material misrepresentations and omissions that caused Plaintiffs to suffer catastrophic losses.

2. LP VII was structured as an EB-5 investment vehicle under the USCIS EB-5 Immigrant Investor Program, 8 U.S.C. § 1153(b)(5). The EB-5 program provides a pathway to permanent resident status for foreign nationals who invest a minimum of $500,000 in a qualifying Targeted Employment Area ("TEA") project and whose investment sustains or creates at least ten full-time jobs. EB-5 investors are acutely dependent on the accuracy of offering disclosures because their immigration status, in addition to their capital, is at risk if the investment fails.

3. LP VII was formed to provide mezzanine financing for One Willoughby Square (the "Project"), a mixed-use commercial tower at 420 Albee Square / 235 Duffield Street, Brooklyn, New York. The CIM prominently featured Forest City Ratner Companies, L.L.C., a subsidiary of Forest City Realty Trust, Inc. ("Forest City") as co-developer in order to induce Chinese investors to commit $500,000 plus a $50,000 issuance fee.

4. The CIM, distributed commencing September 2016, served as the primary offering

document. It contained detailed financial projections, property valuations, construction timelines, occupancy forecasts, and capital structure representations upon which Plaintiffs reasonably and foreseeably relied.

5. Among other material representations, the CIM represented: (a) the Project was designed to preserve capital; (b) the Project would achieve 96% occupancy by Q3 2020; (c) the Project would reach a stabilized value of $600,000,000 by June 2022; and (d) each investor would receive a full return of the $500,000 capital contribution. Each of these representations was materially false when made.

6. To support the $600 million representation, the CIM incorporated the Marshall & Stevens Appraisal (Exhibit 2). The Appraisal projected $600 million based on assumptions for occupancy rates, lease-up timelines, rental income, and capitalization rates that were materially inflated, internally inconsistent, and unsupported by prevailing market conditions. Defendants knew or recklessly disregarded that these assumptions were unreasonable.

7. The offering materials materially overstated Forest City's role in the Project. The Business Plan furnished in connection with the offering represented that the Borrower "will be jointly managed by JEMB Realty Corporation . . . and Forest City Companies, L.L.C.," that "JEMB Realty and Forest City will jointly oversee and manage the development," and that the Bailey-Jerome Family was "currently in negotiations to sell a minority equity interest in the Borrower to Forest City Ratner Companies, L.L.C." (Exhibit 8 at pp. 3, 19, 21). In fact, the only agreement between Forest City and the Borrower identified in the offering materials was a fee-for-services Development Services Agreement signed on September 8, 2016, seven days before the offering materials were distributed (*Id.* at p. 32). Upon information and belief, Forest City never acquired an equity interest in the Borrower and never shared in its management. Forest City's

services arrangement ended in or about September 2017, upon information and belief. Upon information and belief, The Real Deal reported in or about January 2018 that Forest City had not taken an equity stake in the Project and that its arrangement with JEMB had ended. Defendants never corrected the offering materials or told LP VII's limited partners that Forest City's involvement had ended.

8. Although Plaintiffs' capital was placed in a subordinate mezzanine position, the offering was structured so that the CanAm entities would be paid regardless of how the Project performed. First, each investor paid $50,000 in "issue expenses (including a fee paid to the Sponsor)" on top of the $500,000 capital contribution, or $6,000,000 across 120 units, and any portion not consumed by offering costs "will be paid to the General Partner" (Exhibit 1 at p. 10; Exhibit 8 at p. 14). Second, the General Partner received an annual fee of $12,500 per unit, or $1,500,000 per year across 120 units, none of which depended on whether investors' capital was ever returned.

9. The Project failed catastrophically. Construction originally scheduled for completion in 2019 was not delivered until 2021. Pandemic-era delivery compounded lease-up delays, but COVID-19 was not the primary cause of the Project's failure. The risks that materialized were not adequately disclosed in the offering materials.

10. The Project never came close to its projected occupancy. The Business Plan projected stabilized occupancy of 96% by the third quarter of 2020 (Exhibit 8 at p. 42), and the Appraisal projected full occupancy by March 2022 (Exhibit 2). More than five years after the first of those dates, the building remains roughly half empty. In connection with the December 2025 refinancing, the building was divided into two condominium units. Unit 1, comprising the ground floor through the 21st floor (280,348 of the building's 392,567 square feet), was 95% leased. Unit

2, comprising the remaining upper floors, was entirely vacant. The building as a whole was "53.5% occupied" (Exhibit 4, "The Property"; "Condominium Structure"). JEMB itself described the building as "about 65% occupied" in February 2026 (Exhibit 3), and, in May 2026, The Real Deal reported that it was "still about 40 percent vacant" (Exhibit 5). Even the lower floors took years to fill: Unit 1 was 44.7% occupied in 2021, 70.9% in 2022, 82.7% in 2023 and 87.1% in 2024 (Exhibit 4, "Cash Flow Analysis").

11. The Project's financial condition deteriorated into complete distress. The EB-5 mezzanine debt defaulted. The recapitalization that closed on December 15, 2025 (publicly announced in January 2026) involved Deutsche Bank's $125 million refinancing, the admission of new equity members (AVRS/Safra, KSR/Kassin, and Sabbagh), and a third-party appraisal that valued the leased lower floors (Unit 1) alone at $190.8 million as of September 2, 2025. Unit 1 comprised 280,348 square feet of the 392,567-square-foot building. That Unit 1 appraisal was less than one-third of the $600 million stabilized value the 2016 Appraisal assigned to the entire building.

12. The Project cost more than $450 million to build (Exhibit 5), or more than $1,146 per square foot across the building's 392,567 square feet (Exhibit 4, "The Property"). Yet even the building's best-performing space, the 95%-leased lower floors, was appraised in September 2025 at only $681 per square foot (Exhibit 4), roughly 40% below what the building cost to construct. The vacant upper floors were excluded from both that appraisal and the new financing (*Id.*).

13. The construction lender accepted a discounted payoff of $185 million on its $235 million construction loan (Exhibit 4); The Real Deal identified that lender as La Caisse and reported a $55 million write-down (Exhibit 5). Two EB-5 mezzanine loans totaling $96.5 million were released: the senior tranche was released for a $10 million payment at origination plus a $10

million JEMB Member note payable from excess cash flow, while the junior tranche was released for a lien on unrelated property plus a $10 million payment within twelve months (Exhibit 4). The Real Deal reported that the EB-5 investors "absorbed approximately $65 million in losses on nearly $100 million of mezzanine debt," and that together the construction lender and the EB-5 investors "swallowed roughly $120 million in losses" (Exhibit 5). LP VII, whose 120 limited partners (including Plaintiffs) had contributed $60 million in capital, received $10 million at closing, or $83,333.33 per investor. That is a loss of approximately $50 million, or 83.3% of LP VII's invested capital, before counting the $6 million in fees investors paid on top. Upon information and belief, LP VII's remaining prospect of recovery is limited to contingent consideration under the release terms, including a note payable solely from excess cash flow otherwise distributable to the JEMB-controlled member of the ownership venture (*id.*).

14. As a result of Defendants' conduct, each Plaintiff has recovered only $83,333.33 of the $550,000 he or she paid, a net loss of approximately $466,666.67 per Plaintiff and approximately $7,000,000 in the aggregate (¶ 128).

15. Plaintiffs assert claims under: a) Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b-5(a), (b), and (c) promulgated thereunder; b) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); and c) Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b).

16. Plaintiffs also assert claims for: (a) common law fraud; (b) negligent misrepresentation; (c) breach of fiduciary duty; (d) aiding and abetting fraud; (e) unjust enrichment; and (f) violations of New York General Business Law § 349 (Deceptive Acts and Practices). Plaintiffs seek compensatory damages, rescission, disgorgement, punitive damages, and such further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and Section 27 of the Securities Exchange Act of 1934, and 15 U.S.C. § 78aa.

18. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a), as those claims are so related to the federal claims that they form part of the same case or controversy.

19. This Court has personal jurisdiction over all Defendants. The Project is located in Brooklyn, New York, and all Defendants transacted business within this judicial district, directed their conduct at investors in connection with a New York-based project, and are otherwise subject to this Court's jurisdiction.

20. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2). The Project is located at 420 Albee Square, Brooklyn, New York 11201, within the Eastern District of New York, and a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this district.

21. Venue is likewise proper pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, which authorizes suit in any district where any act or transaction constituting the violation occurred.

22. This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332. Each Plaintiff's individual losses of approximately $466,666.67 exceed the $75,000 jurisdictional threshold. Complete diversity of citizenship exists between Plaintiffs and Defendants.

23. In connection with the acts and conduct alleged herein, Defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the mails, telephone, wire transfers, and the facilities of national securities markets.

## PARTIES

24. Plaintiffs are fifteen individuals, each a citizen and resident of the People's Republic of China, each of whom invested $550,000 in LP VII between September 2016 and April 2017, consisting of $500,000 in capital and a $50,000 issuance fee. The fifteen named Plaintiffs are Lingjia Wang, Mo Wang, Meng Wang, Sizhe Chen, Yusheng Huang, Wen Liu, Min Ran, Yan Shi, Xu Wang, Zongle Wang, Qian Wu, Kaijie Zhang, Jing Li, Xuan Zhang, and Nini Dong. Each named Plaintiff brings this action individually to redress the wrongs described herein.

25. LP VII had 120 limited partners, each of whom invested $550,000 (consisting of $500,000 in capital and a $50,000 issuance fee), for approximately $60 million in capital ($66 million including issuance fees).

26. Defendant CanAm Enterprises, LLC ("CanAm") is a New York limited liability company headquartered at 48 Wall Street, New York, NY. CanAm is the parent entity of the broader CanAm organization. CanAm sponsors and manages EB-5 investment offerings, including LP VII, and is the ultimate controlling entity. CanAm created, sponsored, managed, marketed, and sold LP VII through its affiliates. Tom Rosenfeld is President and CEO of CanAm.

27. Defendant CanAm New York Metropolitan Regional Center, LLC ("NYMRC" or "Sponsor") was formed on February 25, 2010 and was designated by USCIS as a regional center on August 26, 2013. NYMRC is the Sponsor of LP VII and prepared and distributed the CIM and CIM Supplement. NYMRC was responsible for structuring the offering, ensuring the accuracy of the representations made therein, and overseeing the deployment of investor funds.

28. Defendant CanAm NY GP VII, LLC ("General Partner") is a Delaware limited liability company formed on October 20, 2015. The General Partner is the general partner of LP VII and is responsible for its day-to-day management. Tom Rosenfeld is its sole member. The

General Partner received management fees of $12,500 per year per unit, totaling approximately $1.5 million per year for 120 units.

29. Defendant CanAm New York Regional Center, L.P. VII ("LP VII") is a New York limited partnership formed on October 21, 2015. LP VII is the New Commercial Enterprise ("NCE") under the EB-5 Immigrant Investor Program. LP VII pooled the funds of 120 limited partners and loaned those funds to JEMB Albee Square. Each limited partner holds an approximately 0.833% interest, contributed $500,000 in capital (plus a $50,000 issuance fee), and the partnership's aggregate capital totals approximately $60 million ($66 million including issuance fees). The offering documents for LP VII include the CIM, CIM Supplement, Limited Partnership Agreement, and Subscription Agreement.

30. CanAm Enterprises, LLC; CanAm New York Metropolitan Regional Center, LLC; CanAm NY GP VII, LLC; CanAm New York Regional Center, L.P. VII are referred to as the "CanAm Defendants."

31. Defendant Tom Rosenfeld is President and CEO of CanAm and the sole member of the General Partner. He exercised ultimate control over all aspects of LP VII's creation, marketing, sale, and management. He authorized and made personal representations to investors through marketing materials, brochures, and the CIM. Rosenfeld is a control person within the meaning of Section 20(a) of the Securities Exchange Act of 1934.

32. Defendant JEMB Albee Square, L.L.C. ("Borrower") is a single-purpose Delaware limited liability company and the direct recipient of the $60 million EB-5 loan from LP VII. The Borrower is the Job-Creating Entity ("JCE") under the EB-5 program and received and controlled the deployment of $60 million in EB-5 investor funds.

33. Defendant JEMB Realty Corporation ("JEMB Realty") is a New York real estate investment firm that served as developer and operator of One Willoughby Square and controls JEMB Albee Square. Its affiliates include BUSAC Real Estate (Montreal) and Helm Equities. JEMB Realty made representations regarding financial viability, completion schedule, job creation, and loan repayment that were incorporated into the LP VII offering materials.

34. Defendant Morris B. Jerome is a principal of JEMB Albee Square and JEMB Realty. He is the addressee of the Marshall & Stevens appraisal transmittal letter dated August 2, 2016, and had direct knowledge of the Project's finances. Morris B. Jerome is quoted in a Crain's New York Business article dated February 9, 2026 (Exhibit 3): "One Willoughby Square is now fully capitalized, refinanced, and has a strong team in place. We're reintroducing this asset with renewed energy and momentum." He had a duty to disclose material facts to investors in LP VII.

35. Defendants Joseph L. Jerome, Jacob Jerome, and Louis J. Jerome ("Jerome Family Defendants") are executives and sponsors of JEMB Realty. They are identified as "Borrower Sponsors" in the Benchmark 2026-V20 Form FWP (Exhibit 4) in connection with the December 15, 2025 $125 million recapitalization of One Willoughby Square. Their continuing involvement establishes their awareness of the Project's condition. They participated in and oversaw the management, financing, and operation of the Project.

36. Defendant Forest City Ratner Companies, L.L.C. (also identified in certain offering materials as Forest City Companies, L.L.C.), a subsidiary of Forest City Realty Trust, Inc. ("Forest City"), is a major real estate developer that was presented as a co-developer of One Willoughby Square and is now affiliated with Brookfield Asset Management. Forest City was formerly a subsidiary of Forest City Realty Trust, Inc., which was acquired by Brookfield in 2018. Upon information and belief, The Real Deal reported in or about January 2018 that Forest City had not

taken an equity stake in the development and that its arrangement with JEMB had ended. This material fact was never disclosed to investors in LP VII.

a. Upon information and belief, Forest City knew at the time it executed the September 8, 2016 advisory agreement that its name, brand, and development track record would be prominently featured in the LP VII offering materials distributed to prospective EB-5 investors. Forest City's institutional reputation – including its development of the Barclays Center arena and the broader Atlantic Yards project – was a material component of the marketing narrative presented to investors.

b. Upon information and belief, Forest City received specific consideration in exchange for its name association with the Project, including advisory fees, future development rights, or other tangible economic benefits under the September 8, 2016 agreement. The nature and amount of this consideration should be confirmed through discovery.

c. Forest City had a duty to correct investor misimpressions once it became aware, or should have become aware, that its name was being used to convey a level of involvement and commitment that did not exist. Upon information and belief, Forest City became aware of the misimpression no later than January 2018, when The Real Deal publicly reported that Forest City had not taken an equity stake in the development. Forest City took no steps to correct the misimpression and did not disclose to LP VII investors or to CanAm that its name should no longer be used in connection with the Project.

d. Forest City's conduct, including executing the advisory agreement knowing its name would be used in offering materials, permitting use of its institutional brand

to induce investor confidence, and failing to correct the resulting misimpression for years, constituted an integral part of the coordinated scheme to present One Willoughby Square as institutionally backed. This conduct was not passive name-lending; it was active, knowing participation in a marketing narrative designed to induce investment by foreign national investors unfamiliar with the Brooklyn real estate market.

37. Defendant Marshall & Stevens Incorporated is an appraisal firm established in 1932, with offices at 1350 Broadway, Suite 2500, New York, NY 10018. Marshall & Stevens prepared the appraisal of One Willoughby Square dated July 12, 2016 (transmittal letter dated August 2, 2016), M&S File ID 11-36-61370, addressed to Morris B. Jerome. The appraisal was a key component of the LP VII offering materials and was relied upon by Plaintiffs in making their investment decisions.

## STATEMENT OF FACTS

### A. The EB-5 Immigrant Investor Program

38. Congress created the EB-5 Immigrant Investor Program through the Immigration Act of 1990 to stimulate the U.S. economy through foreign capital investment and job creation. To qualify, an investor must invest a minimum of $500,000 in a Targeted Employment Area ("TEA") or $1,000,000 elsewhere, and the investment must create or preserve at least ten full-time jobs for U.S. workers. Upon approval of the investor's Form I-526 petition, the investor and qualifying family members receive conditional permanent residency for a two-year period.

39. At the end of the two-year conditional period, the investor must file a Form I-829 petition to remove the conditions on permanent residency. The investor must demonstrate that the required investment was maintained throughout the period and that the requisite jobs were created

or preserved. This dual motivation, both financial and immigration, makes EB-5 investors particularly vulnerable to fraud and misrepresentation. The loss of invested capital does not merely represent a financial setback; it threatens the investor's immigration status and the ability of the investor and his or her family to remain in the United States.

40. The Regional Center Program was established in 1992 to allow investors to pool capital through USCIS-designated regional centers, which aggregate funds and channel them into approved commercial enterprises. The program was most recently reformed through the EB-5 Reform and Integrity Act of 2022. Approximately 95% of all EB-5 investments are made through regional centers.

41. EB-5 investors are overwhelmingly foreign nationals with limited familiarity with the U.S. legal and financial system. Historically, approximately 80% have been Chinese nationals. Many have limited English proficiency and are forced to rely on translated materials, immigration attorneys, and intermediary migration consultants to evaluate investment opportunities. This structural dependency creates a significant information asymmetry between promoters and investors.

42. USCIS reviews Form I-526 petitions solely for immigration eligibility purposes; it does not evaluate the investment merits, the adequacy of disclosures, or the accuracy of financial projections. Approval of an I-526 petition is not a government endorsement of the underlying investment and provides no assurance that investor capital is safe or that promised returns will be achieved.

43. The SEC has issued formal warnings that EB-5 investments constitute securities subject to federal securities laws and has specifically noted the particular vulnerability of foreign investors in the EB-5 context to fraudulent schemes and material misrepresentations. The SEC has

brought numerous enforcement actions against EB-5 promoters and regional centers for securities fraud, unregistered offerings, and misleading disclosures.

44. CanAm's own marketing materials emphasized trust, experience, and credibility as the foundation of its business. The CanAm investor brochure (Exhibit 6) featured the following statement from CanAm's principal, Tom Rosenfeld:

> *"We know how important a decision this is for all our investors. We know what it means to uproot your family to some place thousands of miles away…Therefore, we are committed to providing exceptional service so that your immigration and investment goals can be reached in a timely and seamless fashion."*

45. The same brochure promoted CanAm under the headings "A Reputation of Credibility and Trust" and "Quality Projects with our Investors in Mind," and represented:

> *"Our project finance team selects projects that meet the intent of the EB-5 program, and structure them conservatively knowing that our investors' futures are at stake"*

Exhibit 6. This representation was materially false. The One Willoughby Square offering was structured to prioritize developer economics over investor protection, with below-market interest rates, junior mezzanine positioning, and unsupported financial projections.

46. CanAm further promoted a commitment to "Transparency," representing:

> *"We want our investors to ask us the tough questions so that they can know they are making the right decision."*

This representation was directly belied by CanAm's actual conduct: CanAm failed to disclose Forest City's departure as co-developer, the deteriorating Downtown Brooklyn office market, the mezzanine default, and the near-foreclosure of the Project – all material facts that any reasonable EB-5 investor would have considered significant in deciding whether to invest (Exhibit 6).

47. CanAm's fee structure created a material conflict of interest that was not adequately disclosed in the Offering Materials. CanAm collected a $50,000 non-refundable issuance fee from

each of the 120 investors (totaling $6,000,000), plus an annual management fee of $12,500 per investor (totaling $1,500,000 per year). The Offering Materials also disclosed placement-agent and origination fees. These fees were payable regardless of Project performance. Upon information and belief, approximately $6 million in upfront issue expenses and approximately $1.5 million per year in General Partner fees were actually paid or became payable, representing approximately $19.5 million if paid over the life of the investment through 2026.

48. CanAm specifically targeted Chinese nationals for the One Willoughby Square offering. CanAm distributed Chinese language marketing materials, conducted investor seminars in China, and utilized an extensive network of Chinese migration consultants to identify and recruit prospective investors. CanAm knew that its target investors lacked English proficiency, had no independent access to U.S. commercial real estate market data, and were motivated primarily by immigration objectives rather than investment returns. CanAm exploited these characteristics by presenting a one-sided picture of the Project's prospects while omitting material adverse information.

**B. The One Willoughby Square Project**

49. One Willoughby Square is a Class A office tower, designed as 36 stories (delivered as 35 stories), located at 420 Albee Square / 235 Duffield Street, Brooklyn, New York 11201. The Project was developed by JEMB Realty through its special purpose entity, JEMB Albee Square, L.L.C. (the "Borrower"). The Project site is located within a Targeted Employment Area, certified by the State of New York on May 16, 2016. The JEMB business plan for the Project (Exhibit 8) described the development scope and projected timeline.

50. One Willoughby Square is a Class A office tower at 420 Albee Square, also known as 235 Duffield Street, in Downtown Brooklyn, New York (Exhibits. 2, 4). The offering documents

described it as a planned 36-story building (Exhibits 2, 8); as delivered in 2021, it has 35 stories (Exhibit 4, "The Property"; Exhibit 5). The Project was developed by JEMB Realty through the Borrower (Exhibit 8). On May 16, 2016, the New York State Department of Economic Development certified that the Project site lies within a Targeted Employment Area (*Id.*). The Project's scope, budget, financing structure, and projected timeline were set out in a Comprehensive Business Plan prepared for LP VII investors' Form I-526 petitions (the "Business Plan") (Exhibit 8). A copy of the Business Plan, including the Marshall & Stevens Appraisal and JEMB's pro forma attached to it, was provided to Plaintiffs before investing.

51. The Project's capital structure consisted of three layers: (1) an EB-5 mezzanine loan of $60,000,000 provided by LP VII, junior to the senior construction loan; (2) a senior construction loan of $200,000,000; and (3) developer equity of $138,900,000 (Exhibit 8). The EB-5 loan bore interest at 4.75% per annum. Upon information and belief, that rate was below prevailing market rates for comparable mezzanine financing. The total EB-5 mezzanine exposure was in fact $96,500,000, not $60,000,000 as represented in the CIM.

52. The Project was projected to generate 2,464 or more qualifying jobs through the RIMS II economic input-output model. Of those, 120 investors collectively required 1,200 qualifying job positions, amounting to an allocation of 10 jobs per investor. The job creation projections were based on assumptions regarding construction spending and tenant activity that were not independently verified (Exhibit 8).

53. At the time of the offering, Downtown Brooklyn faced a substantial pipeline of new office supply, including Dock 72 and other developments, creating a known risk of market oversaturation that was not adequately disclosed. The Project was designed to attract Technology, Advertising, Media, and Information ("TAMI") sector tenants, yet no comparable Class A office

building of approximately 500,000 square feet (the size of the building as planned in the Business Plan) had been successfully leased to TAMI tenants in Downtown Brooklyn. Existing large-block tenants were concentrated in government and healthcare. Defendants did not disclose the speculative nature of this demand thesis.

**C. The Offering Materials**

54. On or about September 15, 2016, NYMRC and CanAm distributed the Offering Materials to prospective investors. The Offering Materials consisted of the CIM, a Subscription Agreement, a Limited Partnership Agreement, and related exhibits.

55. The offering was structured as 120 units at $550,000 per unit, comprising $500,000 of invested capital and a $50,000 non-refundable issuance fee, for total gross proceeds of $66,000,000. The $60,000,000 in aggregate capital was to be loaned to the Borrower at an annual interest rate of 4.75% pursuant to a commitment letter dated September 14, 2016.

56. CanAm told investors that its "project finance team selects projects…and structure[s] them conservatively knowing that our investors' futures are at stake" (Exhibit 6). The One Willoughby Square financing was not structured conservatively. Based on the figures in JEMB's pro forma, LP VII's $60 million loan was to be repaid in 2021, together with the construction loan, from the proceeds of a new $434 million permanent mortgage (Exhibit 9; Exhibit 8). Based on those pro forma figures, the Project's projected cash flow would cover debt service on that $434 million loan only approximately 1.01 times in its first year, leaving essentially no margin for error. The pro forma further projected coverage of approximately 0.66 times in 2027, a lease rollover year in which the Project would not generate enough cash to pay its debt (Exhibit 9). By comparison, the lender that refinanced the Project in 2025 treats coverage below 1.25 times as a "Trigger Period" that cuts off cash flow to the owner (Exhibit 4, "Lockbox / Cash

Management"). A plan that depended on refinancing at approximately 1.01 times coverage made the return of Plaintiffs' capital contingent on every assumption in the pro forma being met.

57. The economic terms were structured heavily in favor of the Borrower, putting Plaintiffs' capital at risk for a capped, modest return while reserving the upside for the developer. LP VII's loan bore a fixed rate of 4.75% per annum, simple interest (Exhibit 8), on capital for which each investor had also paid $50,000 in issue expenses (Exhibit 1). The loan carried no equity participation and ranked behind a $200 million senior construction loan (Exhibit 8). JEMB, by contrast, projected a 17.6% levered return on its equity (Exhibit 8). Its pro forma contemplated that the same 2021 permanent refinancing that would repay LP VII's loan would also distribute approximately $164 million to the developer (Exhibit 9).

58. While the CIM contained boilerplate risk factors disclaiming any guarantee of investment return, those disclaimers were contradicted by the overwhelmingly positive tone of the accompanying marketing materials emphasizing safety, capital preservation, and CanAm's track record. For foreign investors with limited English proficiency reviewing complex financial and legal documents under immigration deadline pressure, such boilerplate was wholly insufficient to convey the actual risk profile of the investment.

59. The CIM's generic risk disclosures do not immunize the specific, quantified misrepresentations alleged herein. The bespeaks caution doctrine, properly applied, protects only genuinely forward-looking statements accompanied by meaningful cautionary language. It does not protect statements of present or historical fact that are false when made. See *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("[C]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired"). The CIM's own risk disclosures were directly contradicted by its specific affirmative projections. The CIM simultaneously warned

that investors could lose their entire investment while projecting 96% occupancy by Q3 2020, a stabilized value of $600,000,000, and capital preservation, creating a misleading composite picture in which the quantified projections overwhelmed the generic warnings. A reasonable investor reading both the risk factors and the specific financial projections together would understand the risk warnings as describing remote contingencies, not as qualifying the detailed financial model that formed the basis of the investment decision.

60. Several of the representations on which Plaintiffs relied were statements of present fact, or opinions embedding statements of fact, and are therefore not protected by the bespeaks-caution doctrine. Nor are any of Defendants' statements protected by the PSLRA's statutory safe harbor, which applies only to issuers subject to the Exchange Act's reporting requirements, 15 U.S.C. § 78u-5(a)(1); LP VII was not such an issuer.

a. The Business Plan stated that the Bailey-Jerome Family "is currently in negotiations to sell a minority equity interest in the Borrower to Forest City," and that the Borrower "will be jointly managed by JEMB Realty Corporation…and Forest City" (Exhibit 8). The first is a statement of present fact. The second described Forest City's existing relationship to the Borrower, which the Business Plan itself identified as a "Development Services Agreement" executed seven days before the offering, under which Forest City would oversee aspects of development in accordance with "the budget(s) and timeline(s) approved by JEMB" (*id*). An agreement to provide services subject to JEMB's approval is not joint management of the Borrower.

b. The Appraisal stated that Marshall & Stevens had "forecast an absorption period of 68 months" at 6,355 square feet per month, yet its valuation rested on a schedule

that leased all vacant space in approximately 30 months (Exhibit 2). The Business Plan, in turn, assured investors that the Appraisal "reflects a conservative absorption forecast" (Exhibit 8). Those statements described how the $600 million value had been derived, and they were untrue. See *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185–86 (2015).

61. The Subscription Agreement required investors to represent that they had read and understood the Offering Materials. However, the Offering Materials were provided exclusively in English, to investors whose primary language was Mandarin, who were operating under the time pressure of immigration deadlines, and who were asked to evaluate complex financial structures and legal provisions without independent counsel or access to the underlying financial models.

62. Investor funds were deposited with Signature Bank pending release to the Borrower. Once released, no practical mechanism existed to recover funds in the event of project failure, given the junior mezzanine position and the absence of meaningful equity cushion below the senior loan. Signature Bank subsequently failed in March 2023.

63. In addition to the CIM and the CIM Supplement, the materials on which Plaintiffs relied included the Business Plan, with the Appraisal and JEMB's pro forma, and CanAm's marketing brochure (Exhibits 2, 6, 8, 9). Those materials did not include the agreements on which key representations rested, including the Development Services Agreement with Forest City and the commitment letter for LP VII's loan, which the Business Plan listed as exhibits but did not reproduce (Exhibit 8). Plaintiffs retained U.S. immigration counsel to prepare their Form I-526 petitions, but no one provided them with independent securities, financial, or real estate advice. Investors solicited through CanAm's placement agents paid those agents' fees out of the $50,000 in issue expenses that each investor contributed (Exhibit 1).

64. The Offering Materials were distributed through a network of immigration agencies and migration consultants who were compensated by referral fees for each investor they recruited. These intermediaries had a financial incentive to facilitate closings regardless of whether the investment was suitable for the investor, and this compensation arrangement was not adequately disclosed.

65. The combined effect of the Offering Materials, including the CIM, business plan, appraisal, and marketing materials, was to present One Willoughby Square as a safe, conservative, and capital-preserving investment. In reality, the offering was a speculative bet on an unproven TAMI office market at above-market development costs, below-market EB-5 interest rates, and with aggressive, unsupported financial assumptions that bore no reasonable relationship to market realities.

**D. The Marshall & Stevens Appraisal**

66. The Business Plan attached, as its Exhibit 4.2(k), an appraisal of the Project prepared by Marshall & Stevens Incorporated (the "Appraisal") (Exhibit 2; Exhibit 8). The Appraisal, File No. 11-36-61370, bears an effective date of July 12, 2016 and was transmitted by letter dated August 2, 2016, addressed to "Mr. Morris Jerome, Principal, JEMB Albee Square LLC," the Borrower (Exhibit 2). It was signed by Patrick T. Craig, MAI, MRICS, a Managing Director of Marshall & Stevens and a New York State Certified General Real Estate Appraiser (License No. 46000009039), and identifies Catherine Gu, an Associate (*id.*). The Appraisal states that it was prepared under the Uniform Standards of Professional Appraisal Practice, that "[t]he intended use of the appraisal is for potential EB5 financing purposes," and that its intended users are "JEMB Albee Square LLC and lenders involved with the potential EB5 Financing" (*id.*).

67. The Appraisal reached three value conclusions: (1) an "as is" market value of $194,670,000 for the site as of July 12, 2016; (2) a prospective value of $500,000,000 upon completion on June 1, 2019; and (3) a prospective value of $600,000,000 upon stabilization on June 1, 2022 (Exhibit 2). Those values depended heavily on a real estate tax abatement under the Industrial and Commercial Abatement Program ("ICAP"). The Appraisal's discounted cash flow analysis valued the completed building at $414,000,000 before adding $87,150,000 for the ICAP benefit (*id*.) and valued the stabilized building at $541,000,000 before adding $69,550,000 for ICAP (*id*.). In reaching those values, the Appraisal applied a 4.00% capitalization rate to stabilized net operating income, a 4.50% terminal capitalization rate, discount rates of 6.00% to 6.25%, and 3% annual growth in market rent (*id.*). By comparison, in September 2025 the building's leased lower floors alone were appraised at $190,800,000, using a 6.25% capitalization rate (Exhibit 4). That is less than the value the Appraisal had assigned in 2016 to the vacant site.

68. The appraisal's "as-is" land value of $194,670,000 was grossly inflated. The assembled parcels were acquired for approximately $73,200,000 ($79,200,000 inclusive of acquisition costs) just one to two years prior to the appraisal. The claimed 165% appreciation over that period was unsupported by the available comparable sales data for the Downtown Brooklyn submarket and could not be justified by any reasonable application of recognized appraisal methodology (Exhibit 2).

69. The Business Plan pro forma projected first-year stabilized office rent of $68.87 per square foot (Exhibit 8). The Marshall & Stevens Appraisal concluded that office market rent was $65.78 per square foot (Exhibit 2). As of Q2 of 2025, actual Downtown Brooklyn office asking rents averaged $57.48 per square foot; Brooklyn-wide asking rents averaged $54.11 per square foot. The Appraisal's $65.78 conclusion exceeded 2025 Downtown Brooklyn asking rents by

approximately 14% and Brooklyn-wide asking rents by approximately 22%.

70. The Appraisal employed a terminal capitalization rate of 4.50%, which was aggressive in light of the investor survey on which it relied. The survey reported an average capitalization rate of 5.15% and a range of 3.75% to 8.00%; a 4.00% going-in rate was therefore below the survey average but not below the survey's 3.75% lower bound. Applying the survey's 5.15% average to the Appraisal's stabilized net operating income reduces its direct-capitalization value by approximately $117 million, as alleged below. The September 2025 independent appraisal employed a 6.25% capitalization rate.

71. The Project's economics allocated the upside to JEMB and the downside to the EB-5 investors. JEMB's Pro Forma projected a 17.6% levered return to the developer and a 2021 refinancing that would distribute approximately $164 million to it (Exhibit 8 and Exhibit 9). LP VII's return, by contrast, was capped at 4.75% simple interest on a loan subordinate to a $200 million senior construction loan (Exhibit 8).

72. The appraisal assumed only three months of free rent concessions as part of lease-up. In the actual Downtown Brooklyn office market, prevailing conditions required 12 to 18 months of free rent and tenant improvement ("TI") allowances of $80 to $120 per square foot. The appraisal's failure to account for market-rate concessions materially understated the effective economics of the lease-up and overstated achievable net revenues.

73. Marshall & Stevens knew that its assumptions were unreasonable, or at a minimum recklessly disregarded that fact. Marshall & Stevens is an established New York City appraisal firm with full access to comparable transaction data, market surveys, and industry benchmarks for the Brooklyn office submarket. There was no reasonable basis for the rent, capitalization rate, and concession assumptions employed in the appraisal.

74. The Appraisal was critical to the “capital safety” narrative conveyed by the Offering Materials. By placing the $60,000,000 EB-5 loan at only 10% to 12% of a purported $600,000,000 stabilized value, the Appraisal created the appearance of an enormous equity cushion protecting investor capital. That cushion was illusory. The recapitalization that closed on December 15, 2025 (publicly announced in January 2026) involved a principal equity contribution of approximately $68.5 million, the majority of which consisted of unsecured subordinate loans convertible into preferred equity, and the retirement of approximately $179.5 million in debt, confirming that the Appraisal’s projections bore no reasonable relationship to actual value.

75. The Appraisal's value conclusions were highly sensitive to its choice of capitalization rate. Its direct capitalization analysis applied a 4.00% capitalization rate to stabilized net operating income of $21,011,554 and, after including the ICAP benefit, reached a value of approximately $594.6 million (Exhibit 2). Applying to the same net operating income the 5.15% average capitalization rate reported in the investor survey on which the Appraisal itself relied (*id.*) yields approximately $408 million, or approximately $477.5 million after adding the Appraisal's $69.55 million ICAP adjustment. That is roughly $117 million, or 20%, less than the Appraisal's direct capitalization value. And that survey average was drawn from Manhattan office properties, not a speculative development in Downtown Brooklyn (*id.*).

76. The combined effect of the inflated land value, aggressive revenue assumptions, compressed capitalization rate, and omitted market concessions was to make the investment appear nearly risk-free. In reality, the mezzanine position was effectively unsupported by any meaningful equity cushion, and the Project lacked the revenue-generating capacity to service its debt obligations under any reasonable projection of market conditions.

**E. The Pro Forma Financial Projections**

77. The pro forma financial projections incorporated into the Offering Materials were prepared by JEMB Realty (Exhibit 8 and Exhibit 9). The pro forma projected initial tenant delivery in mid-2019, final delivery in mid-2020, and rapid lease-up to 96% occupancy by the third quarter of 2020.

78. The pro forma projected total effective gross revenues of approximately $439,000,000 over the ten-year projection period, with annual revenues ranging from approximately $36,000,000 to $56,000,000 (Exhibit 8 and Exhibit 9). These projections were based on a first-year stabilized office rent assumption of $68.87 per square foot with 3% annual escalation, as stated in the Business Plan pro forma, not on the Marshall & Stevens Appraisal's $65.78 office-market-rent conclusion.

79. The pro forma was material to the offering because it purported to demonstrate that the Project would generate sufficient cash flow to service all debt obligations, including the EB-5 mezzanine loan, and to return investor capital at maturity. Absent those projections, no reasonable investor would have concluded that the investment preserved capital.

80. The pro forma, as presented in the Business Plan, set out a single scenario, with no downside case and no analysis of the effect of a construction delay, slower leasing, or lower rents (Exhibit 9). It assumed the building would be 85% occupied in 2020 and fully occupied, subject only to a 4% general vacancy allowance, from 2021 onward (*id.*). That pace was faster than the Appraisal's, which the Business Plan itself described as assuming "a 68-month lease-up period with full occupancy achieved in March 2022" (Exhibit 8). The pro forma also assumed that in 2021 JEMB would obtain a $434 million permanent loan to repay the construction loan and LP VII's loan. Based on the pro forma's figures, projected cash flow would cover debt service on that loan only approximately 1.01 times in the first year, and coverage would fall to approximately

0.66 times in 2027 (Exhibit 9). It did not address what would happen to the repayment of LP VII's loan if that refinancing could not be obtained on those terms.

81. The pro forma materially understated the cost of tenant improvements, leasing commissions, and free rent concessions required to achieve the projected occupancy. Prevailing market conditions required TI allowances of $80 to $120 per square foot, leasing commissions of 4% to 6% of total lease value, and 12 to 18 months of free rent. The pro forma's assumptions on these line items were not grounded in market reality and served to overstate projected net revenues.

82. Under realistic assumptions, the pro forma would have shown that the Project was unable to service its debt. The planned permanent financing at a loan-to-value ratio of approximately 73% far exceeded CMBS market norms of 48% to 61% for comparable office transactions, confirming the degree to which the capital structure depended on unrealistic appreciation assumptions.

83. The pro forma was prepared by JEMB Realty, an interested party with a direct financial stake in the success of the offering. It was not independently verified by CanAm, NYMRC, or any neutral third party. Neither CanAm nor NYMRC conducted an independent analysis of the pro forma's assumptions or tested them against available market data.

84. The appraisal and pro forma together formed a mutually reinforcing narrative in which each document's conclusions depended on and amplified the other's assumptions. Neither acknowledged any downside scenario, market divergence, or sensitivity analysis. The result was a one-sided presentation that gave investors no basis on which to evaluate the risks of the investment or to test whether the projected returns were achievable under any reasonable set of assumptions.

**F. Plaintiffs' Investments and Reliance**

85. Each Plaintiff was motivated by dual objectives: (1) obtaining lawful permanent

resident status through the EB-5 Immigrant Investor Program; and (2) achieving the financial outcomes specifically represented in the CIM, including capital preservation, 96% occupancy by Q3 2020, a stabilized property value of $600,000,000 by June 2022, and full return of principal at loan maturity.

86. Each Plaintiff specifically relied upon the following representations in the CIM and related offering materials: (a) 96% occupancy by Q3 2020; (b) stabilized value of $600,000,000; (c) capital preservation and return of principal; (d) Forest City as co-developer, signaling institutional credibility; (e) as-is land value of $194.67 million providing an equity cushion to protect the EB-5 mezzanine debt; (f) characterization of the structure as "conservative"; and (g) repayment of the EB-5 loan in full at maturity.

87. But for the material misrepresentations and omissions alleged herein, no Plaintiff would have invested in LP VII. Each Plaintiff had access to other EB-5 investment opportunities and would have pursued those alternatives absent the misrepresentations.

88. In addition to the $550,000 total outlay ($500,000 capital plus $50,000 issuance fee), each Plaintiff incurred substantial ancillary costs in connection with the EB-5 investment, including immigration agency fees ($20,000–$50,000); U.S. immigration attorney fees ($15,000–$25,000); USCIS filing fees ($3,675 or more); document translation and authentication costs; international travel expenses; and wire transfer fees. These costs were foreseeable consequences of the investment decision and are recoverable as part of Plaintiffs' damages.

89. Each Plaintiff's investment was governed by a Subscription Agreement incorporating by reference the CIM dated September 15, 2016. The Subscription Agreement was offered on a take-it-or-leave-it basis with no opportunity for negotiation. Every investor received the same CIM, the same Marshall & Stevens Appraisal, and the same marketing materials. The

misrepresentations and omissions alleged herein are systemic, arising from the offering documents themselves, and not the product of idiosyncratic or individualized representations.

**G. The Forest City Deception**

90. Throughout the CIM and related marketing materials, Forest City Ratner Companies was prominently featured as the Project's co-developer. This representation served as a central signal of credibility and institutional backing, particularly for Chinese national investors who were unfamiliar with Brooklyn real estate and were evaluating risk through the lens of sponsor reputation.

91. On September 8, 2016, seven days before the date of the CIM, Forest City entered into a "Development Services Agreement" with the Borrower (Exhibit 8). As the Business Plan described it, Forest City agreed to oversee "various aspects of the development" of the Project. Those aspects included ensuring that the Project was built in accordance with applicable law, the contract documents and plans, and "the budget(s) and timeline(s) approved by JEMB"; providing cost management services and supervising the project team procurement process; coordinating contractors, architects, engineers, and interior designers; and developing a marketing strategy and coordinating leasing (*id.*). The Business Plan represented that the Bailey-Jerome Family was in negotiations to sell Forest City a minority equity interest in the Borrower and that JEMB Realty and Forest City were anticipated to jointly oversee and manage the Borrower's development (*id.*). Upon information and belief, Forest City never acquired an equity interest in, and did not obtain management authority over, the Borrower. That belief is based on the Development Services Agreement identified in the offering materials and the December 2025 refinancing documents, which identify the Project's sponsors and do not mention Forest City (Exhibit 4). The Development Services Agreement and the Borrower's governing documents are in Defendants' possession.

92. Forest City was well known in New York City commercial real estate, having developed the Barclays Center arena and the broader Atlantic Yards project. Its association with One Willoughby Square conveyed to investors that an experienced, well-capitalized institutional developer stood behind the Project. This association was material to investors' decisions to commit capital.

93. The NYU Stern School of Business Database of EB-5 Projects (2017) listed Forest City as co-developer of the One Willoughby Square project, reflecting the representations made to the market.

94. Upon information and belief, The Real Deal reported in or about January 2018 that Forest City had not taken an equity stake in the Project. Upon information and belief, Forest City's services arrangement with JEMB had ended by the time of that report. The offering materials were not corrected to disclose these developments.

95. This material fact was never disclosed to LP VII investors. Defendants issued no supplement to the CIM, no corrective disclosure, and no investor communication acknowledging Forest City's non-participation at any time.

96. In 2018, Forest City Realty Trust, Inc. was acquired by Brookfield Asset Management in a transaction valued at approximately $11.4 billion. CanAm and JEMB continued to allow investors to believe that Forest City remained connected to the Project despite this corporate transaction and despite the absence of any genuine involvement.

97. Forest City's brand, development track record, and institutional stature were integral to the investment thesis that Defendants presented. By withholding the truth about Forest City's non-participation, Defendants denied investors the information necessary to reassess their reliance on the co-developer representation.

98. Project reports issued after the close of the offering continued to describe the development team without disclosing Forest City's non-participation. These continuing omissions constituted a series of material misrepresentations by omission that extended well beyond the initial offering period.

99. Defendants' failure to disclose Forest City's non-participation constitutes a material omission in connection with the offer and sale of securities within the meaning of Section 10(b) of the Exchange Act and 17 C.F.R. § 240.10b-5(b) promulgated thereunder.

**H. Construction Delays and Early Warning Signs**

100. The CIM projected substantial completion of construction by June 2019. The building was not delivered until approximately 2021, during the peak of the COVID-19 pandemic (Exhibit 4). This two-year delay had compounding financial consequences, including increased carrying costs, deferred rental revenues, and delivery of the building into a materially softer leasing environment than existed at the time of offering.

101. Publicly available sources documented market conditions signaling significant lease-up difficulty in Downtown Brooklyn as early as September 2016, the same month the CIM was issued. Defendants were experienced New York City commercial real estate professionals with ready access to this information.

102. Warning signs were known or knowable from publicly available market data at the time of offering and throughout the period of Defendants' reporting obligations. Defendants' failure to disclose deteriorating market conditions while continuing to collect fees constitutes a material omission and a continuation of the scheme to defraud.

103. Throughout this period, CanAm continued to collect management fees and issue sanitized investor reports that omitted any reference to market softening, construction delays, or

their impact on projected financial outcomes.

104. Construction delays caused additional direct harm beyond deferred revenue: (a) increased carrying costs on the $235 million construction loan; (b) deferred lease-up revenues that were projected to commence in 2019; and (c) delivery of the building into the post-COVID commercial office market, materially more challenging than the pre-COVID market contemplated by the CIM.

105. Delays also directly harmed investors' immigration benefits. Job creation, a statutory prerequisite for I-829 petition approval, was tied to construction spending timelines. Delays in construction spending deferred qualifying job creation, affecting investors' ability to obtain the unconditional permanent residency they had sought.

106. The interaction between construction delays, loan maturity, and stabilization timelines created a structural default risk that was never disclosed in the CIM or in any subsequent investor communication. Defendants knew or recklessly disregarded that a delay of even twelve months would severely impair the Project's ability to repay the EB-5 mezzanine debt at maturity.

**I. Construction and Engineering Deficiencies Concealed from Investors**

107. At the time of the offering, fundamental engineering and structural design issues remained unresolved.

108. The construction loan increased from the $200 million disclosed in the CIM to $235 million. That increase added $35 million of senior debt ranking ahead of LP VII's loan.

109. Job creation projections were mechanically derived from the construction spending schedule. Any disruption to budget or timeline directly impaired job count. The CIM's exclusion of contingency expenditures from qualifying EB-5 expenditures meant that any budget shortfall reduced qualifying job creation, threatening the immigration benefit that was the primary

motivation for each investor's capital commitment.

**J. Catastrophic Occupancy Failure**

110. The Project's projected lease-up underpinned the offering. The Business Plan represented, based on JEMB's pro forma, that the Project would begin delivering office space in mid-2019 and reach "[s]tabilized [o]ccupancy" of 96% by the "3rd Quarter of 2020" (Exhibit 8). That lease-up drove the pro forma's projected debt service coverage and its planned 2021 permanent refinancing of $434 million, from which the construction loan and the EB-5 loan were to be repaid (Exhibit 9). The Appraisal, which supplied the $600 million stabilized value, likewise assumed that the building would be fully leased by March 2022 and stabilized by June 2022 (Exhibit 2; Exhibit 8).

111. The Project never came close to the pro forma and Appraisal projections. The lender's offering document for the December 2025 refinancing reported the building as a whole "53.5% occupied" (Exhibit 4). JEMB itself put occupancy at "about 65%" in February 2026 (Exhibit 3). In May 2026, The Real Deal, citing CoStar data, reported that the building was "still about 40 percent vacant," which is "roughly double the Downtown Brooklyn average cited by Cushman & Wakefield" (Exhibit 5).

112. The Project's underperformance is not explained by market conditions. According to the September 2025 appraisal summarized in the lender's offering document, Downtown Brooklyn office vacancy was 20.8% as of the third quarter of 2025 (Exhibit 4). The Brooklyn market was also recovering: Crain's reported, citing Cushman & Wakefield, that borough-wide vacancy had fallen for a third consecutive quarter and that new Brooklyn leasing in 2025 was up 19.1% from 2024, "marking the strongest performance since 2020" (Exhibit 3). One Willoughby Square nonetheless remained roughly 40% to 46.5% vacant, about double the submarket rate

(Exhibits 4, 5).

113. The leases the Project did sign confirm the shortfall. As of December 2025, the largest tenants in the leased lower floors were the New York City Board of Education, which operates a public school in 86,160 square feet (30.7% of Unit 1) at $58.34 per square foot; FX FOWLE (now FXCollaborative), the architecture firm that designed the building, in 40,302 square feet (14.4%); and the Office of Court Administration in 27,304 square feet (9.7%) (Exhibit 4, "Tenant Summary"). One of the five largest tenants was JEMB Realty Corp., an affiliate of the Borrower, which had leased 14,508 square feet but was not yet in occupancy (*id.*). The weighted average rent across Unit 1 was $59.61 per square foot (*id.*). That is about 13% below the $68.87 office rent the Business Plan projected for the first stabilized year, before any of the 3% annual increases it assumed (Exhibit 8 at p. 42). And at closing, the Borrower had to reserve $4.79 million for free and reduced rent owed to eleven tenants (Exhibit 4, "Initial and Ongoing Reserves").

114. In connection with the December 15, 2025 refinancing, the Borrower's sponsors created a condominium structure dividing the building in two (Exhibit 4, "The Property"; "Condominium Structure"). Unit 1, comprising the ground floor through the 21st floor (280,348 square feet), was 95% leased and became the sole collateral for the $125 million Deutsche Bank loan. Unit 2, comprising the remaining upper floors, "was vacant as of the origination date," was placed in a separate special purpose entity, and "does not constitute collateral" for the loan (*id.*). The lender, in other words, would lend only against the leased lower floors. The upper half of the tower was excluded from the financing (Exhibit 5), while press reporting described the refinancing as leaving the upper floors "debt-free to aid leasing" (Exhibit 10). The owner of Unit 1 holds a 59% interest in the common elements and appoints three of the five condominium board members, giving it control over the annual budget and special assessments (Exhibit 4). Any value Unit 2 may

eventually produce therefore sits in a sponsor-controlled entity, outside the lender's collateral, and subject to a board controlled by Unit 1.

115. The Project's financial condition deteriorated into complete distress. The EB-5 mezzanine debt defaulted. The recapitalization that closed on December 15, 2025 (publicly announced in January 2026) involved Deutsche Bank's $125 million refinancing, the admission of new equity members (AVRS/Safra, KSR/Kassin, and Sabbagh), and a third-party appraisal that valued the leased lower floors (Unit 1) alone at $190.8 million as of September 2, 2025. Unit 1 comprised 280,348 square feet of the 392,567-square-foot building. That Unit 1 appraisal was less than one-third of the $600 million stabilized value the 2016 Appraisal assigned to the entire building.

**K. Financial Collapse and Mezzanine Default**

116. The $600 million stabilized value projection was never achieved. The Project's financial condition deteriorated into a cascade of distress, the predictable consequence of projections that bore no reasonable relationship to market reality.

117. The EB-5 mezzanine loan defaulted. The mezzanine default exposed LP VII to UCC Article 9 foreclosure proceedings against the limited partnership's interest in the Project, threatening total loss of investor capital without any judicial oversight or investor consent rights.

118. In the recapitalization that closed on December 15, 2025 (publicly announced in January 2026), the Borrower's ownership venture received a principal equity contribution of approximately $68.5 million, the majority of which consisted of $65 million of unsecured loans convertible into preferred equity, all but $1 million of which were made by affiliates of the new common equity members (AVRS/Safra and KSR/Kassin and Sabbagh), with $1 million made by an affiliate of the JEMB Member (Exhibit 4). The new common equity members themselves

contributed only nominal capital (id.). Deutsche Bank provided $125 million in refinancing structured in three pari passu notes at a rate of 6.786% (Exhibit 4), secured exclusively by Unit 1. See also Exhibit 10 (reporting that rating agencies flagged subordinate EB-5 obligations and convertible loans as “lingering risks” in the recapitalized structure). Unit 2 was excluded from the financing and received no mortgage debt.

119. The bifurcation of the building into two condominium units is unusual and was driven by the financial failure of the upper floors. It reflects a restructuring designed to isolate the performing portion of the asset while leaving the non-performing portion outside the capital structure.

120. The prior $235 million construction loan was settled for a discounted payoff of $185 million ($169.5 million net of reserves held by the construction lender) (Exhibit 4). The Real Deal identified the construction lender as La Caisse and reported a $55 million write-down (Exhibit 5).

121. The EB-5 mezzanine debt was settled as follows: the senior mezzanine lender released its collateral in exchange for a $10 million payment at loan origination and a $10 million JEMB Member note payable from excess cash flow; the junior mezzanine lender released its collateral in exchange for a lien on unrelated property and a $10 million payment required within twelve months (Exhibit 4). The Real Deal reported that investors “absorbed approximately $65 million in losses on nearly $100 million of mezzanine debt.”

122. The timing of the mezzanine default relative to investor reports demonstrates that CanAm knew or recklessly disregarded the imminence of default while continuing to issue communications that gave investors no basis to understand the severity of the Project’s financial condition.

123. The December 2025 recapitalization, which involved more than five counterparties, two condominium units, CMBS securitization, approximately $68.5 million in principal equity contributions, convertible subordinate loans, two separate mezzanine debt settlements, and a discounted construction loan payoff, reflected months of confidential negotiation. Throughout this period, investors continued to receive sanitized Project reports with no disclosure of the pending recapitalization or its implications for their investment. Meanwhile, statutory pre-judgment interest under CPLR § 5004 continued to accrue on Plaintiffs' losses at 9% per annum from the dates of their investments, compounding the magnitude of Defendants' liability with each passing year.

**L. Investor Losses and Coercive Distribution**

124. Plaintiffs received a distribution of $83,333.33 per investor, characterized by Defendants as "Realization Proceeds". This amount represents approximately one-sixth, approximately 16.7 cents on the dollar, of each investor's $500,000 capital contribution and reflects an 83.3% loss of invested capital. It does not include any return of the $50,000 issuance fee.

125. The $50,000 issuance fee paid by each Plaintiff represents a pure loss. The services ostensibly covered by this fee were not performed with the care, competence, or fidelity owed to investors. This fee was extracted from investors while Defendants possessed material information that, if disclosed, would have caused investors to decline the investment.

126. In connection with the distribution, investors were required to execute an Authorization to Wire Funds Form (Exhibit 7) as a condition of receiving their $83,333.33 distribution. The form required each investor to release the Limited Partnership and its affiliates "from any and all claims and liability resulting from the distribution," and to acknowledge a pre-printed statement that the investor was "electing not to have [his or her] pro rata share of

Realization Proceeds reinvested into an Other Investment" and agreed "to be excluded from the 80% Resolution." On information and belief, investors had no meaningful choice: the form offered no alternative election and was presented on a "take it or leave it" basis, without adequate disclosure, without independent legal advice, and without sufficient time to evaluate the consequences of the release and waiver being demanded.

127. Some investors also executed Discontinuance of Immigration Process forms (Exhibit 7) on or about February 4, 2026, terminating their pending EB-5 immigration proceedings. The loss of immigration status and the abandonment of years of immigration process represent separate, non-monetary harms resulting from Defendants' misrepresentations.

128. Each Plaintiff paid $550,000, consisting of a $500,000 capital contribution and a $50,000 fee, and has received $83,333.33. Each Plaintiff's net out-of-pocket loss is therefore approximately $466,666.67, or 84.8% of the amount paid, consisting of $416,666.67 in unreturned capital (83.3% of the capital invested) and the $50,000 fee. Plaintiffs collectively suffered net losses of approximately $7,000,000, consisting of approximately $6,250,000 in unreturned capital and $750,000 in fees. Upon information and belief, LP VII's only remaining prospect of further recovery is a contingent note payable solely from the Project's excess cash flow. These figures do not include the consequential costs described in paragraph 88, any immigration-related harm, or the time value of money. On their state law claims, Plaintiffs are entitled to pre-judgment interest at 9% per annum under CPLR §§ 5001 and 5004 on each sum from the date it was paid, and, as to the amount later returned, until the date it was received. On their federal claims, Plaintiffs seek pre-judgment interest in the Court's discretion.

129. These losses represent the culmination of a systematic and prolonged betrayal spanning nine years, from the September 2016 offering through the February 2026 distribution.

During this time, Defendants collected fees, issued misleading reports, concealed material adverse information, and ultimately delivered investors a 16.7-cent recovery. Throughout this period, New York statutory pre-judgment interest under CPLR § 5004 continued to accrue on Plaintiffs' losses at 9% per annum.

130. Following the close of the offering, CanAm issued a series of project reports (Reports 01 through 06) purporting to provide investors with material updates regarding the Project's status and financial condition.

131. These reports were designed and drafted to maintain investor confidence and discourage inquiry. Each report described developments in favorable terms while systematically omitting material adverse information that, if disclosed, would have put investors on notice of the Project's deterioration.

132. Reports 01 through 06 failed to disclose that, upon information and belief, Forest City had not taken an equity stake in the Project and had not served as co-developer in any meaningful sense.

133. These reports failed to disclose:

a. the softening of the Brooklyn office market, the widening gap between CIM projections and actual market conditions, or the increasing improbability of achieving the projected 96% occupancy and $600 million stabilized value;

b. construction delays or their financial consequences, including the increase in the construction loan from $200 million to $235 million and the corresponding implications for the Project's debt service capacity and EB-5 mezzanine repayment;

c. occupancy failures as they developed, including the failure to achieve projected lease-up milestones and the reliance on government tenants rather than the TAMI

tenants projected in the CIM;

d. the Project's financial distress, including the mezzanine loan default, the restructuring negotiations with La Caisse and the mezzanine lenders, the construction lender's write-down, and the recapitalization discussions—all of which were occurring while investors continued to receive sanitized communications.

134. The overall effect of the reports was to create and maintain a false impression of orderly progress. An investor reading only these reports would have had no reasonable basis to understand that the Project was failing, that the EB-5 debt had defaulted, or that the investment's expected outcomes had become unachievable.

135. After the offering closed, CanAm issued a series of periodic project reports to LP VII's limited partners (Reports 01 through 06). The General Partner, CanAm, and Rosenfeld owed those limited partners a duty to disclose material facts concerning their investment. Each report described the status of the Project while omitting material facts that CanAm and Rosenfeld knew, as follows:

a. Report 01 and Report 02

i. In or about the second half of 2017 and in or about 2018, respectively, CanAm issued Reports 01 and 02, which purported to update LP VII's limited partners on the status of the One Willoughby Square Project. Upon information and belief, each report was prepared and approved by CanAm and Rosenfeld and distributed to all LP VII limited partners, including Plaintiffs. That belief is based on CanAm's role as Sponsor and on its representation that investors receive "convenient access to our Investor

Online System (IOS)" for "important documentation … during the entire investment period" (Exhibit 6).

ii. Neither report disclosed that Forest City's only agreement with the Borrower identified in the offering materials was the Development Services Agreement, under which Forest City would oversee aspects of development according to "the budget(s) and timeline(s) approved by JEMB" (Exhibit 8). Nor did either report disclose that, as alleged in paragraph 91, Forest City had not acquired an equity interest in, or management authority over, the Borrower. Those facts were contrary to the Business Plan's statements that the Borrower "will be jointly managed" by JEMB Realty and Forest City and that JEMB's principals were "currently in negotiations to sell a minority equity interest in the Borrower to Forest City" (*id.*). By the time Report 02 was issued, more than a year had passed since those statements were made, and neither report stated that any such sale had occurred.

b. Report 03

i. In or about 2019, CanAm issued Report 03, a further periodic update on the status of the Project. Upon information and belief, based on the facts alleged in paragraph 135(a)(i), Report 03 was prepared and approved by CanAm and Rosenfeld and distributed to all LP VII limited partners, including Plaintiffs.

ii. In addition to omitting the facts concerning Forest City described in paragraph 135(a)(ii), Report 03 did not disclose that the senior construction loan ranking ahead of LP VII's loan was $235 million (Ex. 4, Loan No. 4

summary, n.7; Ex. 5). That was $35 million more than the $200 million senior loan described in the Business Plan (Ex. 8 at PDF p. 41), increasing the debt that had to be repaid before LP VII.

c. Report 04, 05, and 06

i. In or about 2020 or 2021, 2022 or 2023, and 2024 or early 2025, respectively, CanAm issued Reports 04, 05, and 06, further periodic updates on the status of the Project. Upon information and belief, based on the facts alleged in paragraph 135(a)(i), each was prepared and approved by CanAm and Rosenfeld and distributed to all LP VII limited partners, including Plaintiffs.

ii. None of those reports disclosed that the Project had missed the schedule on which the repayment of LP VII's loan depended. The offering materials projected completion by June 1, 2019 (Ex. 2), temporary certificates of occupancy by September 2019 (Ex. 8 at PDF p. 26), and stabilized occupancy of 96% by the third quarter of 2020 (*id.* at PDF p. 42). The building was not delivered until 2021 (Ex. 4, Loan No. 4 summary, n.7). As a result, the $434 million permanent refinancing from which the Pro Forma projected LP VII's loan would be repaid in 2021 (Ex. 9) never occurred, and LP VII's loan remained unpaid.

iii. Nor did those reports disclose how far the Project's performance fell short of the Pro Forma. The Pro Forma projected that the building would be fully occupied, subject to a 4% vacancy allowance, from 2021, and would generate net operating income of approximately $27.9 million in 2022,

$28.7 million in 2023, and $30.4 million in 2024 (Ex. 9). Instead, even the building's lower floors, later designated Unit 1, were only 70.9%, 82.7%, and 87.1% occupied in those years, and generated net operating income of approximately $2.8 million, $7.0 million, and $8.8 million, respectively (Ex. 4, "Cash Flow Analysis"). The upper floors were still vacant as late as December 2025 (*id.*, "The Property").

d. The Recapitalization

i. In the recapitalization that closed on December 15, 2025, LP VII's pledged collateral was released as part of a discounted payoff (Ex. 4, Loan No. 4 summary, n.7; *see* ¶ 13). LP VII was a party to that release, and upon information and belief its terms were negotiated by CanAm, as LP VII's general partner, in the months before closing. That belief is based on the complexity of the transaction, which involved discounted payoffs of the construction lender and both EB-5 lenders, the admission of new members, the creation of a condominium structure, and a loan appraisal dated September 2, 2025 (*id.*). CanAm did not disclose the terms of the release to LP VII's limited partners before it closed.

e. Knowledge and Breach

i. CanAm and Rosenfeld knew the facts omitted from each report when it was issued. CanAm and NYMRC had described the Development Services Agreement with Forest City and presented JEMB's Pro Forma in the Business Plan (Ex. 8 at PDF pp. 32, 42). LP VII's loan terms required it to enter into an intercreditor agreement with the senior construction lender (*id.*

at PDF p. 44). And as general partner of LP VII, the lender on the Project, CanAm was entitled to information concerning the Project's construction, leasing, operations, and financing. By issuing reports that described the status of the Project while omitting those facts, and by negotiating the release of LP VII's collateral without disclosing its terms, the General Partner, CanAm, and Rosenfeld breached their duty of disclosure to LP VII's limited partners, as alleged in Count VII, and concealed facts bearing on Plaintiffs' claims, as alleged in the Statute of Limitations section above.

**M. July 8, 2026 Investment Status Report**

136. On or about July 8, 2026, CanAm and Albee Nominee, LLC issued the One Willoughby Square I Investment Status Report (the "July 2026 Report"), the most recent communication purporting to discharge Defendants' ongoing disclosure obligations to Plaintiffs.

137. The July 2026 Report advanced an optimistic repayment narrative, representing that future payments to investors would be contingent on "value realization" from Unit 2 through a possible "sale or refinancing." The report represented that the sponsors were "fully committed to... advocating for your interests." These representations gave investors a false impression of the likelihood and mechanism of repayment.

138. The July 2026 Report is independently actionable because, by voluntarily discussing repayment prospects, Defendants assumed a duty to disclose all facts necessary to make those statements not misleading.

139. 17 C.F.R. § 240.10b-5(b) inherently prohibits half-truths, or statements that are technically accurate but omit material qualifying information.

140. The July 2026 Report materially omitted the following facts, each of which was

necessary to make the report's affirmative representations not misleading: (a) the existence and terms of the $125 million senior CMBS debt encumbering Unit 1; (b) that only Unit 1 constitutes mortgage collateral and that Unit 2 "does not constitute collateral" under the Deutsche Bank financing; (c) the absence of any contractual waterfall or dedicated obligation requiring Unit 2 proceeds to be applied to EB-5 repayment; (d) the prior mezzanine default and the discounted payoff terms; (e) the specific terms of the EB-5 collateral release and the consideration received; (f) the existence and terms of $65 million in insider subordinate debt convertible to preferred equity; (g) the independent appraised value of $190.8 million; (h) the condo governance structure giving Unit 1 a 59% interest and three of five board seats, which could limit Unit 2 owners' ability to act independently; (i) the Industrial and Commercial Abatement Program (ICAP) tax abatement implications for Unit 2 valuation; and (j) NYCEDC deed restrictions and reversion risk encumbering Unit 2. Each of these facts is documented in publicly available SEC filings, including the Benchmark 2026-V20 Form FWP (Exhibit 4).

141. Taken together, the July 2026 Report told investors that repayment might come from Unit 2, while the lender's offering document publicly filed with the SEC (Exhibit 4) and public records showed that Unit 2 is owned by a different entity, is pledged to no one for investors' benefit, sits behind $125 million in senior debt and $65 million in insider convertible debt, and is encumbered by governance, tax, and reversion constraints the report never mentions.

142. The divergence between what the lender disclosed in its offering document publicly filed with the SEC (Exhibit 4) and what Defendants communicated to Plaintiffs gives rise to a strong inference of scienter. There is no innocent explanation for selectively disclosing these material facts to institutional counterparties while withholding them from investors who had far greater need for the information.

143. The July 2026 Report is the most recent instance of Defendants' continuing practice of issuing sanitized investor communications that omit material adverse information. This practice has persisted from the September 2016 offering through the present.

## STATUTE OF LIMITATIONS

144. Plaintiffs' claims are timely on each of the following independently sufficient grounds, each of which is pleaded in the alternative.

145. **Continuing Violations.** Defendants' fraud did not end with the September 2016 offering. From 2017 through early 2026, CanAm issued at least six investor project reports (Reports 01–06) constituting independent, continuing violations of Section 10(b) of the Exchange Act and 17 C.F.R. § 240.10b-5. The July 2026 Report constitutes an additional, separate violation. Each misleading communication is a discrete act of fraud with its own accrual date. The most recent violation falls within two years of the filing of this complaint.

146. **Fraudulent Concealment and Equitable Estoppel.** Defendants are estopped from asserting a statute-of-limitations defense to Plaintiffs' state-law claims. As fiduciaries, the General Partner, CanAm, and Rosenfeld owed LP VII's limited partners a duty to disclose material facts concerning their investment. Instead, after the offering they issued periodic reports that described the status of the Project while omitting the facts alleged in paragraph 135: the true nature of Forest City's role, the missed construction and stabilization schedule, the failure of the 2021 refinancing on which repayment of LP VII's loan depended, the Project's actual operating performance, and the terms on which LP VII's collateral was released. Plaintiffs, who reside in China, relied on those reports, which CanAm made available through its Investor Online System (Exhibit 6), for information about the Project. Plaintiffs did not learn the terms of the December 15, 2025 recapitalization, or the amount they would recover, until those terms were disclosed in connection

with the distribution to LP VII's limited partners in early 2026. They commenced this action within months thereafter. Where a fiduciary's failure to disclose prevents a beneficiary from discovering the facts giving rise to a claim, the fiduciary is estopped from relying on the statute of limitations. *See Zumpano v. Quinn*, 6 N.Y.3d 666, 674–75 (2006); *Ross v. Louise Wise Servs., Inc.*, 8 N.Y.3d 478, 491 (2007).

147. **New York Statute of Limitations.** Plaintiffs' state-law claims are timely.

a. *Claims based on fraud.* Under CPLR § 213(8), an action based on fraud must be commenced within the greater of six years from accrual or two years from the time the plaintiff discovered the fraud or could with reasonable diligence have discovered it. For the reasons alleged in paragraphs 135 and 146, Plaintiffs did not possess, and could not with reasonable diligence have obtained, knowledge of facts from which the fraud alleged here could reasonably be inferred until they received the distribution documentation on or about February 24, 2026. This action was commenced within two years of that date. *See Sargiss v. Magarelli*, 12 N.Y.3d 527, 532 (2009).

b. *Claims arising from the recapitalization.* Plaintiffs' claims arising from the December 15, 2025 recapitalization, including the release of LP VII's collateral and the related failures of disclosure alleged in paragraph 135(d) and in Count VII, accrued no earlier than December 2025 and are timely under any applicable limitations period. See CPLR 213(1), 214(4).

## CLAIMS FOR RELIEF

### COUNT I

***Violation of Section 10(b) of the Securities Exchange Act of 1934 and 17 C.F.R. § 240.10b-5***

*(Against All Defendants)*

148. Plaintiffs incorporate by reference paragraphs 1 through 143 above, which set forth the factual allegations regarding Defendants' material misrepresentations and omissions in connection with the offer and sale of LP VII limited partnership interests.

149. The LP VII units are "securities" within the meaning of Section 3(a)(10) of the Exchange Act. They constitute "investment contracts" because each investor: (a) invested money; (b) in a common enterprise; (c) with an expectation of profits; (d) derived predominantly from the efforts of others. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946); *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).

150. Section 10(b) of the Exchange Act and 17 C.F.R. § 240.10b-5 prohibit any person, in connection with the purchase or sale of a security, from: (a) employing any device, scheme, or artifice to defraud; (b) making any untrue statement of a material fact, or omitting to state a material fact necessary to make the statements made not misleading; or (c) engaging in any act, practice, or course of business that operates as a fraud or deceit upon any person.

151. Defendants made the following specific materially false statements in the CIM, the Marshall & Stevens Appraisal, and related offering materials: (a) that the Project would achieve 96% stabilized occupancy by the third quarter of 2020, based on JEMB's pro forma; (b) that the Marshall & Stevens Appraisal reflected a reliable stabilized value of $600 million; (c) that the investment was structured for capital preservation with minimal downside risk; (d) that Forest City was a co-developer and that the Bailey-Jerome Family was in negotiations to sell it a minority equity interest in the Project; (e) that market rental rates in the surrounding area supported the Borrower's pro forma projections; and (f) that the Project would be completed and stabilized on schedule.

152. The Appraisal's $600 million stabilized value rested on assumptions that its own

data did not support. Although the Appraisal stated that Marshall & Stevens had "forecast an absorption period of 68 months" at 6,355 square feet per month, its valuation schedule reached full occupancy in approximately 30 months by leasing the vacant space at a materially faster pace. That schedule produced the March 2022 full occupancy and June 2022 stabilization on which the value depended (Exhibit 2). The Business Plan's pro forma, by contrast, assumed faster stabilization, with 96% occupancy by the third quarter of 2020. The Appraisal's 4.50% terminal capitalization rate was below the entire 4.75%-8.00% range for Manhattan office properties in the investor survey on which it relied, and its 4.00% going-in rate was below that survey's 5.15% average (*id.*). Applying that survey average to the Appraisal's own stabilized net operating income reduces its direct-capitalization value by approximately $117 million. By comparison, in September 2025 the building's leased lower floors alone were appraised at $190.8 million using a 6.25% capitalization rate (Exhibit 4), less than the "as is" value the Appraisal had assigned in 2016 to the vacant site (Exhibit 2).

153. The offering materials represented that the investment was structured for capital preservation. Yet, based on the figures in the Borrower's own pro forma, projected cash flow would cover debt service on the planned permanent loan only approximately 1.01 times at stabilization, declining to approximately 0.66 times in 2027 (Exhibit 9), levels inconsistent with capital preservation.

154. The CIM and marketing materials represented Forest City Ratner Companies as a co-developer and conveyed that the Bailey-Jerome Family was in negotiations to sell Forest City a minority equity interest in the Project. Those representations were misleading because Forest City had not taken an equity stake and, upon information and belief, did not obtain management authority over the Borrower. Defendants knew or recklessly disregarded these facts at the time the

representations were made to Plaintiffs.

155. In addition to the affirmative misrepresentations described above, Defendants omitted the following material facts: (a) that Forest City had not taken an equity stake in the Project; (b) that prevailing Brooklyn market conditions could not support the Appraisal's absorption and rent projections; (c) that significant new commercial office supply was entering the Brooklyn submarket; (d) that the EB-5 mezzanine interest rate of 4.75% was, upon information and belief, below prevailing market rates for comparable mezzanine financing; (e) that CanAm entities and Rosenfeld would receive approximately $6 million in upfront issue expenses plus approximately $1.5 million per year in General Partner fees, payable regardless of Project performance, while those conflicts were inadequately disclosed; (f) that no independent party had reviewed or validated the Appraisal's assumptions; (g) that the Borrower's pro forma figures implied a DSCR of approximately 0.66x in 2027, demonstrating a structural inability to service debt in that projected period; and (h) that the total EB-5 mezzanine exposure was $96.5 million, not the $60 million disclosed in the CIM.

156. The CanAm Defendants acted with scienter. Scienter may be established by facts showing either (1) motive and opportunity to commit fraud or (2) strong circumstantial evidence of conscious misbehavior or recklessness, and the inquiry is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-24 (2007); *Novak v. Kasaks*, 216 F.3d 300, 307-08, 311 (2d Cir. 2000). Both are present here.

a. *Motive and opportunity.* The CanAm Defendants' compensation depended on selling LP VII units, not on the Project's success. For each of the 120 units sold, the investor paid $50,000 in "issue expenses (including a fee paid to the Sponsor)," and

any portion not spent on offering costs "will be paid to the General Partner." CanAm's affiliate, CanAm Investor Services, LLC, was authorized to act as a placement agent entitled to placement fees paid from that $50,000 and to "ongoing compensation based on a portion of loan interest." And the General Partner could receive an annual "General Partner's Fee" (Exhibit 1). None of that compensation depended on whether investors' capital was repaid. The CanAm Defendants controlled the offering, the preparation and distribution of the Business Plan, and all communications with investors, and so had the opportunity to make the misrepresentations and omissions alleged herein.

b. *Conscious misbehavior or recklessness.* When the offering was made, the CanAm Defendants knew facts, many of them stated in their own Business Plan, that contradicted what they told investors:

   i. They presented JEMB's Pro Forma, with its projection of 96% stabilized occupancy by the third quarter of 2020, while acknowledging that it "was prepared by JEMB Realty without independent verification by the General Partner" and "reflects a shorter lease-up period" than the Appraisal, which assumed "a 68-month lease-up period with full occupancy achieved in March 2022" (Exhibit 8).

   ii. They told investors that CanAm's projects are "structure[d]... conservatively knowing that our investors' futures are at stake" (Exhibit 6). Yet the pro forma they presented made repayment of LP VII's loan depend on a $434 million refinancing that the pro forma itself projected would be covered by cash flow only 1.01 times (Exhibit 9).

iii. They described the Development Services Agreement with Forest City in the Business Plan while stating in the same document that the Borrower "will be jointly managed" by JEMB Realty and Forest City (Exhibit 8).

iv. They attached the Appraisal to the Business Plan and told investors it "reflects a conservative absorption forecast" (Exhibit 8), although the Appraisal showed on its face that its valuation rested on a schedule leasing all vacant space in approximately 30 months, not the 68 months it stated (Exhibit 2).

v. The same Appraisal reported that the average asking rent for Class A and B office space in Downtown Brooklyn was $42.38 per square foot (Exhibit 2), yet the pro forma they presented assumed $68.87. It also applied a terminal capitalization rate below the entire range of the investor survey on which it relied (*id.*).

vi. CanAm held itself out as having "nearly 30 years of experience exclusively in promoting and administering private and government immigration-linked investment funds," and represented that its "underwriting team conducts exhaustive due diligence in order to qualify a project as a potential investment" (Exhibit 6). A sponsor with that experience that conducted the diligence it claimed would have recognized each of the facts above.

c. Whether the CanAm Defendants knew these facts contradicted their representations or recklessly disregarded them, the inference of scienter is at least as compelling as any opposing inference.

157. No competing nonculpable inference displaces the strong inference of scienter. The

COVID-19 pandemic did not emerge until more than three years after the September 2016 offering and cannot retroactively cleanse misrepresentations that were false when made; scienter is assessed as of the date of the alleged misstatement. The structural deficiencies of the sub-1.0x DSCR, inflated land value, absorption divergence, and below-market interest rate were embedded in the offering at inception; the pandemic accelerated a collapse already foreseeable from those deficiencies. Nor do the CIM's generic risk disclosures demonstrate good faith where the same document simultaneously projected 96% occupancy, $600 million stabilized value, and capital preservation; all outcomes contradicted by data Defendants possessed. See *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("[C]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired").

158. Scienter of JEMB Realty and Morris B. Jerome is established by: JEMB's experience as an established New York real estate developer with direct and specific knowledge of the Brooklyn office market; preparation of a pro forma whose figures implied a 1.01x DSCR at stabilization, well below conventional underwriting levels; knowledge that a 73% loan-to-value ratio exceeded conventional underwriting standards; actual knowledge that Forest City had not taken an equity stake; receipt of below-market EB-5 capital at 4.75% while, upon information and belief, comparable mezzanine rates were higher; failure to alert investors as the Project's financial condition deteriorated; Morris B. Jerome's personal receipt of the Marshall & Stevens Appraisal reflecting assumptions JEMB knew to be unsupported; and the Jerome Family Defendants' involvement in the December 15, 2025 refinancing at 6.786%, compared with the 4.75% EB-5 rate charged to Plaintiffs.

159. Marshall & Stevens acted with scienter. Recklessness sufficient to plead scienter includes conduct that is "highly unreasonable" and "an extreme departure from the standards of

ordinary care." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (quoting *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir. 1978)). The Appraisal, signed by Patrick T. Craig, MAI, MRICS, a Managing Director of Marshall & Stevens, departed from its own data in each of the following respects

a. It stated that Marshall & Stevens had "forecast an absorption period of 68 months" at 6,355 square feet per month, but valued the building on a schedule that leased all 429,949 square feet of vacant space in approximately 30 months, more than double its own stated rate. That schedule produced the March 2022 full occupancy and June 2022 stabilization on which the $600 million value depended (Exhibit 2).

b. It applied a 4.50% terminal capitalization rate below the entire 4.75%-8.00% range of the investor survey on which it relied. It also applied a 4.00% going-in rate below the survey's 5.15% average and the 4.59% average of its own comparable sales. It did so for a Brooklyn development that was only 14.9% pre-leased (*id*).

c. It concluded that office market rent was $65.78 per square foot. That figure was 7.5% above the $61.17 average of its own comparable leases, and 55% above the $42.38 average asking rent for Class A and B office space in Downtown Brooklyn that it reported (*id.*).

d. Each of those departures increased the Appraisal's value conclusions, and together they supported the $600 million value presented to EB-5 investors. Marshall & Stevens knew the Appraisal would be used for that purpose, because it identified "potential EB5 financing" as the Appraisal's intended use (*id.*). The inference that Marshall & Stevens at least recklessly disregarded the unreasonableness of its conclusions is at least as compelling as any opposing inference. *Tellabs, Inc. v.*

*Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

160. Loss causation is further established through the following corrective disclosures and revelatory events:

a. The recapitalization that closed on December 15, 2025 (publicly announced in January 2026) required a principal equity contribution of approximately $68.5 million, the majority of which consisted of unsecured subordinate loans convertible into preferred equity, retirement of approximately $179.5 million in debt, and an independent appraisal valuing the leased lower floors (Unit 1) at $190.8 million, finally revealing the falsity of the $600,000,000 stabilized value projection;

b. In February 2026, the distribution of $83,333.33 per investor (approximately 16.7 cents on the dollar) revealed the magnitude of losses concealed through years of sanitized Project reports;

c. In July 2026, the Investment Status Report selectively disclosed repayment prospects while omitting ten categories of material adverse information, constituting a further half-truth. Each event was a materialization of risks Defendants' misrepresentations and omissions had concealed, not the realization of generic market risk. See *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005).

161. Plaintiffs justifiably relied on Defendants' false statements and omissions. Reliance is established by each Plaintiff's direct reliance on the CIM, the Appraisal, and the marketing materials in making their investment decisions.

162. As a direct and proximate result of Defendants' violations of Section 10(b) and 17 C.F.R. § 240.10b-5, each Plaintiff suffered a net loss of approximately $466,666.67, representing

their $550,000 investment less the $83,333.33 returned to date. Plaintiffs collectively suffered net losses of approximately $7,000,000, consisting of approximately $6,250,000 in unreturned capital and $750,000 in fees. Plaintiffs seek compensatory damages, rescissionary damages, pre-judgment interest at the applicable rate, attorneys' fees, and costs.

**COUNT II**
***Scheme Liability Under Section 10(b) and 17 C.F.R. § 240.10b-5(a) and (c)***
*(Against All Defendants)*

163. Plaintiffs incorporate by reference paragraphs 1 through 143 above, including all factual allegations regarding the coordinated conduct among Defendants in structuring, marketing, and administering the LP VII offering.

164. 17 C.F.R. § 240.10b-5(a) and (c) make it unlawful, in connection with the purchase or sale of any security, "[t]o employ any device, scheme, or artifice to defraud" or "[t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person." 17 C.F.R. § 240.10b-5(a), (c). Liability under those provisions does not depend on whether a defendant was the "maker" of a statement within the meaning of 17 C.F.R. § 240.10b-5(b). A defendant who, with scienter, disseminates false or misleading statements to investors, or otherwise engages in deceptive conduct in furtherance of a scheme to defraud, is primarily liable. *Lorenzo v. SEC*, 587 U.S. 71, 78–80 (2019). As alleged below, each Defendant engaged in deceptive conduct beyond the making of any misstatement, and Plaintiffs relied on that conduct.

165. Defendants collectively employed a device, scheme, and artifice to defraud Plaintiffs consisting of: (a) the coordinated preparation and dissemination of materially false offering materials, including the CIM and the Appraisal; (b) the systematic suppression of adverse information through sanitized periodic Project reports that concealed the Project's deteriorating financial condition; (c) the receipt of approximately $6 million in upfront issue expenses plus

approximately $1.5 million per year in General Partner fees, payable regardless of Project performance, while the related conflicts were inadequately disclosed; and (d) a December 2025 recapitalization that crystallized Plaintiffs' losses at approximately 83.3% while preserving Defendants' economic positions.

166. Each Defendant played a distinct and essential role in the scheme: CanAm entities and Rosenfeld conceived, organized, and managed the LP VII offering, controlled all investor communications, and collected management fees; JEMB Realty prepared the Borrower's pro forma knowing its DSCR assumptions were below sustainable levels; the Jerome Family Defendants controlled JEMB's participation and benefited from below-market EB-5 capital at 4.75%; Marshall & Stevens provided the inflated $600 million Appraisal knowing it would be presented to investors as independent validation; and Forest City lent its name and brand to the offering without disclosing that it had not taken, and did not take, an equity stake.

a. The CanAm Defendants and Rosenfeld engaged in the following specific deceptive acts, each of which constitutes conduct independent of and distinguishable from any misstatement: (a) structuring the LP VII fee arrangement to generate approximately $6 million in upfront issue expenses plus approximately $1.5 million per year in General Partner fees payable regardless of Project performance, while inadequately disclosing the related conflicts; (b) issuing at least six periodic investor project reports (Reports 01 through 06) between 2017 and early 2026 that systematically omitted material adverse information regarding Forest City's departure, market deterioration, construction delays, occupancy failures, the mezzanine default, and the pending recapitalization; and (c) negotiating and executing the December 2025 recapitalization while continuing to collect

management fees and issue sanitized investor communications that concealed the negotiations and their implications for investor capital.

b. The JEMB Defendants engaged in the following specific deceptive acts: (a) preparing the Borrower's pro forma financial projections with figures implying debt service coverage of approximately 1.01x declining to 0.66x—projections that JEMB knew were inconsistent with the "capital preservation" narrative—while representing those projections as achievable; (b) executing the December 2025 recapitalization on terms that favored JEMB insiders, including approximately $65 million in unsecured subordinate loans convertible into preferred equity, at the direct expense of LP VII investors; and (c) directing the bifurcation of One Willoughby Square into two condominium units to isolate the performing lower floors (Unit 1) as collateral for $125 million in Deutsche Bank refinancing while leaving the substantially vacant upper floors (Unit 2), themselves the only potential source of EB-5 investor recovery, outside the capital structure.

c. Marshall & Stevens prepared and signed the Appraisal knowing that it would be used to obtain the EB-5 financing (Exhibit 2). In doing so, it:

   i. stated that it had "forecast an absorption period of 68 months" for the building's 429,949 square feet of vacant space, at 6,355 square feet per month, while basing its valuation on an absorption schedule that leased all of that space in approximately 30 months. That rate was more than double its own stated forecast, and it produced the Appraisal's assumptions of full occupancy by March 2022 and stabilization by June 2022, on which its $600 million value depended (Exhibit 2); and

ii. applied a 4.50% terminal capitalization rate below the entire 4.75%–8.00% range (average 5.94%) reported in the investor survey of Manhattan office properties on which it relied. It also applied a 4.00% going-in rate below both that survey's 5.15% average and the 4.59% average of its own comparable sales. It did so for a Brooklyn office development that was only 14.9% pre-leased (Exhibit 2).

d. Forest City engaged in the following specific deceptive acts: (a) executing the September 8, 2016 advisory agreement with JEMB Albee Square with knowledge that its name and institutional brand would be prominently featured in the LP VII offering materials as "co-developer," thereby knowingly lending its reputation to induce investor confidence; and (b) failing to correct the misimpression of its involvement after public reporting in or about January 2018 that Forest City had not taken an equity stake in the development, despite knowing that LP VII investors continued to rely on the co-developer representation. Forest City's conduct was not passive name-lending; it was affirmative participation in a coordinated scheme to present One Willoughby Square as institutionally backed when it was not.

167. Additionally, CanAm entities and Rosenfeld violated 17 C.F.R. § 240.10b-5(b) through material omissions in periodic Project reports distributed to Plaintiffs and through the July 2026 Report, as alleged in the factual sections of this Complaint. Each such communication omitted material adverse information regarding the Project's financial condition, debt service coverage, and valuation that Plaintiffs were entitled to receive.

168. Scheme liability under 17 C.F.R. § 240.10b-5(a) and (c) is independent of whether a particular Defendant was the "maker" of any specific statement. Each Defendant who knowingly

participated in the fraudulent scheme, whether by preparing false materials, concealing material information, or facilitating the offer and sale of LP VII units under false pretenses, is liable regardless of whether that Defendant personally made a statement to Plaintiffs.

169. As a direct and proximate result of Defendants' scheme, Plaintiffs suffered the losses described in paragraph 162 above. Plaintiffs seek compensatory damages and disgorgement of fees and compensation wrongfully obtained from the LP VII offering, including approximately $6 million in upfront issue expenses and approximately $1.5 million per year in General Partner fees, with amounts actually paid pleaded upon information and belief.

## COUNT III
### ***Control Person Liability Under Section 20(a) of the Securities Exchange Act of 1934***
*(Against Rosenfeld, CanAm Enterprises, Morris B. Jerome, and the Jerome Family Defendants)*

170. Plaintiffs incorporate by reference COUNT I above, including all allegations as to Defendants' violations of Section 10(b) of the Exchange Act and 17 C.F.R. § 240.10b-5.

171. Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), imposes joint and several liability on every person who, directly or indirectly, controls any person liable under the Exchange Act, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

172. Rosenfeld exercised actual control over the CanAm entities' conduct underlying the Section 10(b) violation alleged in COUNT I, for the reasons set forth in paragraphs 156-169 above. Rosenfeld was a culpable participant in those violations.

173. CanAm Enterprises exercised actual control over the CanAm entities' conduct underlying the Section 10(b) violation alleged in COUNT I, for the reasons set forth in paragraphs 156-169 above. CanAm Enterprises was a culpable participant in those violations.

174. Morris B. Jerome and the Jerome Family Defendants controlled JEMB Realty's

participation in the LP VII transaction, including the preparation and submission of the Borrower's pro forma that JEMB knew reflected a DSCR insufficient to service the Project's debt. Morris B. Jerome personally received the Marshall & Stevens Appraisal. The Jerome Family Defendants obtained the December 2025 refinancing of the Project at an interest rate of 6.786%. Morris B. Jerome and the Jerome Family Defendants were culpable participants in the violations alleged in COUNT I.

175. By reason of the foregoing, Rosenfeld, CanAm Enterprises, Morris B. Jerome, and the Jerome Family Defendants are jointly and severally liable for the violations of Section 10(b) and 17 C.F.R. § 240.10b-5 alleged in COUNT I, in the same amounts as the primary violators.

**COUNT IV**
***Voidability Under Section 29(b) of the Securities Exchange Act of 1934***
*(Against CanAm Defendants)*

176. Plaintiffs incorporate by reference COUNT I above, including all allegations regarding the CanAm Defendants' violations of Section 10(b) of the Exchange Act and 17 C.F.R. § 240.10b-5 in connection with the offer and sale of LP VII units.

177. Section 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b), provides that every contract made in violation of any provision of the Exchange Act or of any rule or regulation thereunder, and every contract whose performance involves the violation of any such provision, is void as regards the rights of any person who, in violation of any such provision, shall have made or engaged in the performance of any such contract.

178. The Subscription Agreements and Limited Partnership Agreements pursuant to which Plaintiffs invested in LP VII were made in violation of Section 10(b) of the Exchange Act and 17 C.F.R. § 240.10b-5, in that the CanAm Defendants induced Plaintiffs to execute those agreements through the material misrepresentations and omissions alleged in COUNT I.

179. The CanAm Defendants are the violating parties within the meaning of Section 29(b). Plaintiffs are the innocent parties who were induced to enter into those contracts through fraud and are entitled to seek voidance and rescission.

180. Plaintiffs are entitled to rescind their Subscription and Limited Partnership Agreements and to recover the consideration paid thereunder, with pre-judgment interest at the applicable rate from the date of each Plaintiff's investment. Each Plaintiff is entitled to a net recovery of approximately $466,666.67, representing the $550,000 invested less the $83,333.33 already returned, together with interest thereon from the date of investment.

**COUNT V**
***Common Law Fraud***
*(Against All Defendants)*

181. Plaintiffs incorporate by reference paragraphs 1 through 143 above insofar as they set forth the factual allegations regarding Defendants' scheme to defraud through coordinated preparation and distribution of materially misleading offering documents and appraisal reports.

182. Under New York common law, a claim for fraud requires proof of: (1) a material misrepresentation of fact; (2) knowledge of its falsity; (3) intent to induce reliance; (4) justifiable reliance by the plaintiff; and (5) resulting damages.

183. As required by Fed. R. Civ. P. 9(b), Defendants made the materially false representations identified with particularity in COUNT I, paragraphs 152 through 156, including the representations concerning occupancy, valuation, capital preservation, Forest City's role, rental rates, and completion; each was false when made.

184. Each Defendant made the foregoing representations with knowledge of their falsity or with reckless disregard for their truth or falsity. Scienter is established as alleged in COUNT I, incorporated herein by reference.

185. Defendants also fraudulently concealed the material facts identified in COUNT I, including Forest City's non-participation, adverse Brooklyn office-market conditions, the Borrower's debt service coverage projections, the Appraisal's absorption divergence, and total EB-5 exposure. The related continuing omissions are incorporated from COUNT I.

186. Plaintiffs justifiably relied on Defendants' misrepresentations and omissions in deciding to invest and suffered actual damages of $466,666.67 per Plaintiff. Plaintiffs seek compensatory damages, punitive damages, pre-judgment interest, and reasonable attorneys' fees.

**COUNT VI**
***Negligent Misrepresentation***
*(Against All Defendants)*

187. Plaintiffs incorporate by reference paragraphs 1 through 143 above insofar as they set forth the factual predicates for Plaintiffs' negligent misrepresentation claim.

188. Under New York law, negligent misrepresentation requires: (1) a special relationship of trust or confidence between the parties; (2) an inaccurate statement; (3) reasonable reliance on the statement; and (4) resulting injury.

189. Each Defendant occupied a special relationship of trust and confidence with Plaintiffs: CanAm Enterprises and NYMRC, as fund manager and regional center, owed a duty of care to Plaintiffs arising from their assumption of responsibility for the accuracy of the offering materials; Marshall & Stevens, as a professional appraisal firm retained to provide an independent valuation, owed a duty of care to foreseeable investors who would rely on the Appraisal; and JEMB, as developer providing the business plan and financial projections incorporated into the offering documents, owed a duty of care to the investors those materials were designed to attract.

190. Each Defendant made inaccurate statements of material fact and failed to exercise reasonable care in the preparation and dissemination of those statements.

a. *Marshall & Stevens*. Under New York law, a professional who supplies information is liable to a non-client for negligent misrepresentation where (1) it knew its work would be used for a particular purpose; (2) a known party or parties was intended to rely on it in furtherance of that purpose; and (3) its own conduct links it to that party and evinces its understanding of that reliance. *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536 (1985); *Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson*, 73 N.Y.2d 417 (1989). The Appraisal states that "[t]he intended use of the appraisal is for potential EB5 financing purposes" and that its intended users are "JEMB Albee Square LLC and lenders involved with the potential EB5 Financing" (Exhibit 2). That EB-5 financing was LP VII's $60 million loan, funded entirely by the capital of LP VII's 120 limited partners, including Plaintiffs. The Appraisal was then attached as an exhibit to the Business Plan presented to those investors (Exhibit 2 and Exhibit 8). Marshall & Stevens thus knew the particular purpose of its work and the identity of those who would rely on it. By naming the EB-5 lenders as intended users in the report itself, it engaged in conduct linking it to them. The Appraisal was prepared without reasonable care for the reasons alleged herein.

b. *JEMB Realty and Morris B. Jerome*. Defendants assumed a duty of care to Plaintiffs by preparing the Borrower's business plan and pro forma financial projections for express inclusion in the LP VII offering materials. JEMB knew that these materials would be distributed to prospective EB-5 investors as part of the investment decision-making process. The pro forma was not prepared for JEMB's internal use; it was prepared specifically to induce investment in LP VII. The

known class of intended reliers was the 120 prospective limited partners.

c. *Forest City,* by permitting its name and institutional brand to be used in the LP VII offering materials, knew or should have known that prospective investors would rely on the association with Forest City in evaluating the credibility and institutional backing of the Project. The misimpression created by Forest City's name association was a material component of the investment decision for Plaintiffs, each of whom was a Chinese national with limited familiarity with the Brooklyn real estate market who relied on the reputations of named participants as a proxy for independent due diligence.

191. Plaintiffs reasonably relied on Defendants' statements given the professional credentials of the parties making them, the apparent independence of the Appraisal from a nationally recognized firm, and the consistency of the narrative presented across the offering documents.

192. As a direct and proximate result, each Plaintiff suffered damages of $466,666.67. Plaintiffs seek compensatory damages and pre-judgment interest.

**COUNT VII**
***Breach of Fiduciary Duty***
*(Against the General Partner, CanAm Enterprises, and Rosenfeld)*

193. Plaintiffs incorporate by reference paragraphs 1 through 143 above insofar as they pertain to the fiduciary obligations owed by the General Partner, CanAm Enterprises, and Rosenfeld to LP VII limited partners.

194. Under New York law and the LP VII partnership agreement, the General Partner owed fiduciary duties of loyalty, care, and disclosure to the limited partners, including Plaintiffs. Rosenfeld, as the sole member and controlling individual of the General Partner, and CanAm

Enterprises, as the controlling entity behind the General Partner and its affiliates, are likewise subject to fiduciary obligations to the limited partners.

195. LP VII is a New York limited partnership governed by Article 8-A of the New York Partnership Law, the New York Revised Limited Partnership Act (Ex. 8). Under Partnership Law § 121-403(a) and (c), the General Partner has the duties of a partner in a partnership without limited partners, including the duty under Partnership Law § 43 to account for, and hold as trustee, any benefit derived from any transaction connected with the conduct or liquidation of the partnership. The CIM states that the Limited Partnership Agreement contains, "to the extent permitted by applicable law, a broad waiver of the fiduciary duty of loyalty and the corporate opportunity doctrine" (Ex. 1 at PDF p. 18). By its terms, that waiver does not reach the General Partner's duties of care and disclosure or its obligation of good faith. In any event, New York law does not permit a party to contract out of liability for fraud, bad faith, or willful or grossly negligent misconduct. *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 384–85 (1983); *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 554 (1992). The conduct alleged in paragraphs 193 through 200 falls outside any permissible waiver.

196. The conduct alleged herein is not the exercise of legitimate business discretion protected by any contractual exculpation. The allegations establish that the General Partner, CanAm Enterprises, and Rosenfeld: (a) knew that the CIM's financial projections were materially false when made; (b) knowingly concealed Forest City's non-participation as co-developer; (c) continued to receive performance-independent fees while the Project deteriorated, including approximately $6 million in upfront issue expenses and approximately $1.5 million per year in General Partner fees, while the related conflicts were inadequately disclosed; (d) released LP VII's mezzanine collateral on terms that favored the JEMB sponsors at the expense of limited partners;

and (e) issued a series of sanitized Project reports that systematically omitted material adverse information. These acts constitute bad faith and self-dealing that no contractual waiver (however broadly drafted) can shield from liability under New York law.

197. The General Partner, CanAm Enterprises, and Rosenfeld breached the duty of loyalty by: (a) structuring a fee arrangement of approximately $6 million in upfront fees plus approximately $1.5 million per year in management fees that compensated them regardless of Project performance; (b) continuing to extract fees as the Project deteriorated and investor capital eroded; and (c) failing to deploy Plaintiffs' capital in the best interests of the limited partners.

198. The General Partner, CanAm Enterprises, and Rosenfeld breached the duty of care by failing to conduct adequate due diligence regarding the feasibility of the Project's financial projections and by failing to challenge the materially unreasonable assumptions underlying the Appraisal.

199. The General Partner, CanAm Enterprises, and Rosenfeld further breached their fiduciary duties by: releasing LP VII's mezzanine collateral on terms that favored the Project sponsors at the expense of the limited partners; agreeing to $65 million in insider subordinate loans convertible into preferred equity without adequate consideration to the limited partners; and issuing the July 2026 Report in a manner that omitted material facts regarding the Project's financial condition.

200. The General Partner, CanAm Enterprises, and Rosenfeld breached the duty of disclosure by: (a) misrepresenting material facts as alleged herein; (b) failing to disclose Forest City's departure from the Project; (c) failing to disclose the Borrower's own debt service coverage ratio projections; (d) failing to disclose the nature and extent of fee conflicts of interest; and (e) failing to provide timely and accurate updates regarding adverse developments.

201. As a direct and proximate result of these breaches, each Plaintiff suffered damages of $466,666.67. Plaintiffs seek disgorgement of all fees received in breach of fiduciary duty, punitive damages, and equitable relief.

**COUNT VIII**
***Aiding and Abetting Fraud***
*(Against Marshall & Stevens)*

202. Plaintiffs incorporate by reference paragraphs 1 through 143 and the allegations of COUNT V above, insofar as they pertain to Marshall & Stevens' preparation of the materially inflated Appraisal.

203. Under New York law, a defendant is liable for aiding and abetting fraud where (1) an underlying fraud existed; (2) the defendant had actual knowledge of that fraud; and (3) the defendant provided substantial assistance to advance its commission. *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009); *Krys v. Pigott*, 749 F.3d 117, 127 (2d Cir. 2014). A defendant provides substantial assistance when it affirmatively assists, helps conceal, or fails to act when required to do so, thereby enabling the fraud to proceed, and its conduct proximately causes the plaintiff's harm. *Kaufman v. Cohen*, 307 A.D.2d 113, 126 (1st Dep't 2003).

204. CanAm Enterprises, NYMRC, Rosenfeld, and JEMB committed primary fraud as alleged in COUNT V, incorporated herein by reference.

205. Marshall & Stevens actually knew of the fraud, including its direct access to contemporaneous Brooklyn office market data showing that the 96% occupancy and $68.87 per-square-foot rental projections were unachievable; its use of a 4.00% going-in capitalization rate and a 4.50% terminal capitalization rate that were aggressive in light of the survey data, including the 5.15% survey average; its 165% markup of the Project's land value above known acquisition cost of approximately $73,200,000 ($79,200,000 inclusive of acquisition costs) without credible

comparable-sales support; and its knowledge that the Appraisal would be incorporated into EB-5 offering materials and distributed to prospective investors to induce investment (Exhibit 2). The specific facts supporting these inferences, including the 68-month internal absorption analysis, the engagement scope, and the market databases, are set forth in subparagraphs (a) through (d) below.

a. Upon information and belief, Marshall & Stevens knew at the time of the Appraisal that the assembled parcels comprising the Project site had been acquired for approximately $73.2 million ($79.2 million inclusive of acquisition costs) within one to two years prior to the Appraisal date. Marshall & Stevens appraised the "as-is" land value at $194,670,000 (a 165% markup above the known acquisition cost) without identifying comparable sales transactions that would support such appreciation in the Downtown Brooklyn submarket during the relevant period.

b. The Appraisal's lease-up assumptions were internally inconsistent in a way that inflated its value conclusions. The Appraisal stated that Marshall & Stevens had "forecast an absorption period of 68 months" for the building's 429,949 square feet of vacant space, which "indicates 6,355 square feet will be absorbed per month". Yet, the absorption schedule on which the valuation was built leased all of that space in approximately 30 months, three floors per quarter from September 2019 through March 2022. That is an absorption rate of roughly 14,300 square feet per month, more than double the rate the Appraisal itself forecast. The accelerated schedule produced the Appraisal's assumption that the building would be "fully occupied by Mar-22" and the June 1, 2022 stabilization date on which its $600 million stabilized value depended. The report was signed by Patrick T. Craig, MAI, Managing Director of Marshall & Stevens, and does not reconcile the forecast it

states with the schedule it uses (Exhibit 2).

c. Upon information and belief, the engagement letter or scope of work documents governing Marshall & Stevens' retention established that the Appraisal would be incorporated into offering materials for an EB-5 investment vehicle and distributed to prospective investors. Marshall & Stevens thus knew that third-party investors – not merely Morris B. Jerome – would rely on the Appraisal's conclusions in making investment decisions.

d. Marshall & Stevens had access to, and regularly utilized, standard industry databases including CoStar, Real Capital Analytics, and the Cushman & Wakefield market reports for the Brooklyn office submarket. These databases showed that comparable Brooklyn office properties traded at capitalization rates of 5.5% to 7.0% during the relevant period, representing 150 to 225 basis points higher than the rates employed in the Appraisal. Marshall & Stevens' valuation departed from the available market data notwithstanding contradictory evidence then in its possession, reflecting a knowing disregard of that evidence rather than an exercise of professional judgment.

206. Marshall & Stevens provided this assistance knowingly.

207. Plaintiffs seek all compensatory damages, punitive damages, pre-judgment interest, and reasonable attorneys' fees.

**COUNT IX**
***Unjust Enrichment***
*(Against CanAm Defendants)*

208. Plaintiffs incorporate by reference paragraphs 1 through 143 above.

209. Under New York law, a claim for unjust enrichment requires: (1) the defendant was

enriched; (2) at the plaintiff's expense; and (3) it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.

210. The CanAm Defendants were enriched through: (a) approximately $6 million in upfront issuance and placement fees; (b) approximately $1.5 million per year in General Partner fees; and (c) additional administrative and other fees; totaling approximately $19.5 million, upon information and belief, over the life of the investment through 2026. The fees were payable regardless of Project performance and the related conflicts were inadequately disclosed.

211. This enrichment came at the direct expense of Plaintiffs, each of whom invested $550,000 and has received only approximately $83,333.33 in return.

212. In the alternative, JEMB Defendants and incoming equity members were unjustly enriched by receiving a discounted payoff, the release of LP VII's mezzanine collateral, and insider subordinate debt convertible into preferred equity, all at Plaintiffs' expense. Plaintiffs are entitled to a constructive trust and equitable lien over proceeds attributable to Unit 2 of the Project.

213. This claim is pleaded in the alternative to Plaintiffs' contract based claims, pursuant to Federal Rule of Civil Procedure 8(d)(3), which expressly permits a party to "state as many separate claims or defenses as it has, regardless of consistency." Plaintiffs plead unjust enrichment for the specific scenario in which the Subscription Agreements and Limited Partnership Agreements are declared void or unenforceable, whether under Section 29(b) of the Exchange Act (COUNT IV), or because the contracts were procured by fraud and are therefore voidable at the election of the defrauded party. If the governing contracts are voided, the Clark-Fitzpatrick bar is inapplicable because no "valid and enforceable written contract" would exist to preclude quasi-contractual recovery. See *Clark-Fitzpatrick, Inc. v. Long Island R.R. Co.*, 70 N.Y.2d 382, 388 (1987). The CanAm Defendants cannot simultaneously argue that the contracts shield them from

unjust enrichment liability while also defending the enforceability of contracts that Plaintiffs allege were procured through fraud.

214. Plaintiffs seek restitution of all fees and compensation unjustly retained, pre-judgment interest, and equitable relief.

**COUNT X**
***Violations of New York General Business Law § 349***
*(Against All Defendants)*

215. Plaintiffs incorporate by reference paragraphs 1 through 143 above insofar as they set forth deceptive acts and practices by Defendants that are consumer-oriented and affect the public interest.

216. The transactions in which Plaintiffs were deceived were centered in New York. The offering was sponsored and issued by NYMRC, a New York limited liability company, on behalf of LP VII, a New York limited partnership, whose General Partner operates from 48 Wall Street, New York, New York (Exhibit 1; Exhibit 7; Exhibit 8). Plaintiffs' capital contributions were deposited into escrow in New York and were lent to the Borrower for the development of a project in Brooklyn, New York. Plaintiffs' investments were made in, and their losses were suffered through, New York entities and a New York project.

217. Defendants engaged in deceptive acts and practices within the meaning of GBL § 349 by: (a) distributing the CIM containing materially false occupancy and financial projections; (b) providing a materially inflated Appraisal by a nationally recognized firm to lend false credibility to those projections; (c) characterizing a high-risk, illiquid speculative investment as conservative with capital preservation characteristics; (d) concealing the departure of Forest City from the Project; (e) concealing the Borrower's own debt service coverage ratio projections demonstrating inability to service Project debt; and (f) failing to disclose material conflicts of

interest in the fee structure.

218. Defendants employed a coordinated scheme of deception involving: (a) a professionally prepared but materially false CIM; (b) an inflated appraisal from a nationally recognized firm providing a false imprimatur of legitimacy; (c) a false narrative presenting Forest City as an active co-developer; and (d) the systematic omission of adverse facts from all investor communications.

219. These deceptive acts were misleading in a material way and went to the heart of Plaintiffs' investment decisions: the projected occupancy rates and rental revenues determined the Project's appraised value; the appraised value determined whether the investment was adequately collateralized; and the capital preservation characterization determined whether the investment was appropriate for the targeted investor population.

220. Plaintiffs suffered direct injury as a result of these deceptive acts and practices: each Plaintiff lost approximately $466,666.67.

221. Plaintiffs are entitled to all relief available under GBL § 349(h), including the specific remedies set forth in the Prayer for Relief.

222. The LP VII offering satisfies the consumer-oriented conduct requirement of GBL § 349 because Defendants' deceptive practices had a broader impact on consumers at large. See *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995). The EB-5 investment program is a congressionally created pathway to immigration for foreign national investors. CanAm's offering was not a private, arm's-length negotiation between sophisticated parties; it was a standardized, mass-marketed product distributed to 120 unrelated Chinese national investors through a network of immigration agencies and migration consultants, using Chinese-language marketing materials, investor seminars conducted in China, and an

extensive referral system. These practices are consumer-oriented because they employed the same marketing techniques, standardized documents, and intermediary distribution channels used in consumer financial products. The targeted investor population—foreign nationals with limited English proficiency, no independent access to U.S. commercial real estate data, and motivation driven primarily by immigration objectives—was a consumer class, not a group of sophisticated Wall Street counterparties negotiating bespoke transactions.

223. Defendants' deceptive conduct had a broader impact beyond the fifteen named Plaintiffs. The same CIM, Appraisal, and marketing materials were provided to all 120 LP VII investors, each of whom was subjected to the same material misrepresentations and omissions. Moreover, CanAm operates multiple EB-5 regional center funds across the United States, and the same marketing practices, including the use of Chinese-language materials, migration consultant networks, and standardized CIMs emphasizing "capital preservation" and institutional co-developers, were employed across CanAm's portfolio of offerings. The deceptive practices alleged herein are not unique to this transaction but reflect a recurring pattern of conduct directed at the consuming public of EB-5 investors.

a. The LP VII offering was marketed using techniques functionally indistinguishable from consumer product distribution. CanAm conducted investor seminars in Beijing, Shanghai, Guangzhou, Shenzhen, and other Chinese cities, using Chinese-language presentation materials, brochures, and promotional videos, and engaged immigration agencies and migration consultants, each compensated per investor referral, to recruit individuals from the general public. As alleged in paragraph 89 above, the CIM, Subscription Agreement, and Limited Partnership Agreement were standardized, non-negotiable, take-it-or-leave-it documents with no opportunity for

individual negotiation, due-diligence access, or modification.

b. As described in paragraph 43 above, the SEC has recognized that EB-5 offerings are securities and has identified EB-5 investors as particularly susceptible to fraud and deceptive practices. The SEC Investor Alert warned that "fraudsters may exploit the EB-5 program" and that "investors may be targeted based on their... language or country of origin." The SEC also brought enforcement actions involving consumer-facing EB-5 securities sales, including *SEC v. Luca Int'l Grp., LLC*, No. 3:15-cv-03101-CRB (N.D. Cal. filed July 6, 2015), and *SEC v. Path Am., LLC,* No. 2:15-cv-01350-JLR (W.D. Wash. filed Aug. 24, 2015).

c. Unlike traditional private placements negotiated at arm's-length between sophisticated institutional counterparties, the LP VII offering was distributed to 120 unrelated Chinese national individuals. As alleged in paragraphs 61, 63, and 89 above, investors lacked independent access to the underlying financial models, comparable market data, or due diligence materials; had no opportunity to negotiate; and lacked independent U.S. counsel. None had prior experience investing in U.S. commercial real estate. These standardized, mass-distributed, intermediary-driven terms and language barriers are functionally indistinguishable from consumer transactions. See *Karlin v. IVF America, Inc.*, 93 N.Y.2d 282, 290 (1999) (standardized professional services marketed to the public satisfy consumer-orientation requirement); *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006).

d. The $500,000 minimum investment amount does not convert a mass-marketed, standardized product into a sophisticated private placement. The consumer orientation inquiry under GBL § 349 focuses on the nature of the conduct –

specifically, whether it has a "broader impact on consumers at large" – not the dollar amount at issue. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995). A consumer product that happens to be expensive is no less consumer-oriented than an inexpensive one. Moreover, the EB-5 investors' primary motivation was immigration, not financial return, further aligning their position with that of consumers purchasing a service rather than sophisticated investors allocating capital.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants as follows:

A. Compensatory damages not less than $466,666.67 per Plaintiff ($7,000,000 collectively for the fifteen Plaintiffs), inclusive of the $50,000 issuance fee paid by each Plaintiff, together with all consequential and incidental damages;

B. Rescissionary damages in an amount sufficient to make Plaintiffs whole;

C. Disgorgement of all fees and compensation wrongfully obtained by Defendants, including approximately $6 million in issuance and placement fees, approximately $1.5 million per year in General Partner fees, and all other compensation extracted from LP VII investor capital, with amounts actually paid pleaded upon information and belief;

D. Punitive damages on the common law fraud, breach of fiduciary duty, and aiding and abetting fraud claims;

E. Pre-judgment interest on all damages awarded, including New York statutory pre-judgment interest at the rate of 9% per annum under CPLR § 5004, calculated from the date of each Plaintiff's initial investment (beginning September 2016) through the date of judgment, at the applicable statutory rate;

F. Post-judgment interest pursuant to 28 U.S.C. § 1961;

G. Under New York General Business Law § 349(h):

i) injunctive relief enjoining Defendants from continuing the deceptive acts and practices alleged herein;

ii) actual damages sustained by each Plaintiff, or fifty dollars ($50), whichever is greater;

iii) an increase of damages, in the Court's discretion, to an amount not to exceed three times each Plaintiff's actual damages, up to one thousand dollars ($1,000) per Plaintiff, upon a finding that Defendants willfully or knowingly violated GBL § 349; and

iv) reasonable attorney's fees to Plaintiffs as prevailing plaintiffs.

H. Such other and further relief as the Court deems just and proper.

Dated: October 6, 2026
New York, New York

Respectfully submitted
**LAW OFFICES OF ROBERT V. CORNISH JR., PC**

*/s/ Robert V. Cornish, Jr.*
Robert V. Cornish, Jr., Esq. (4755104)
Jennifer L. Harrington, Esq. (5828769)
32 Mercer Street, 3rd Floor
New York, NY 10013
Tel: (307) 264-0535
rcornish@rcornishlaw.com
jharrington@rcornishlaw.com
*Attorneys for Plaintiffs*